# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LISA ZALASKI, ANIMAL RIGHTS  :
FRONT, INC., and DEREK V. OATIS :
  Plaintiffs,      :
            :
v.           :    **CIVIL ACTION NO.**
            :    **3:08-cv-601 (VLB)**
CITY OF HARTFORD and   :
SERGEANT ALBERT,    :
  Defendants.     :    **March 31, 2010**

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 48]

The Plaintiffs, Lisa Zalaski (hereinafter "Zalaski"), Derek Oatis ("Oatis"), and Animal Rights Front, Inc. ("Animal Rights") initiated this action against the City of Hartford ("Hartford") and Sergeant Daniel Albert ("Albert") in connection with Zalaski and Oatis' arrest by members of the City of Hartford Police Department during an April 23, 2006 Animal Rights protest at the Hartford Marathon Foundation, Inc.'s ("Hartford Marathon") Red Nose Run event.  The Plaintiffs assert two claims for relief pursuant to 42 U.S.C. § 1983 for violation of their First Amendment rights, claims for false arrest, false imprisonment and malicious prosecution under 42 U.S.C. § 1983 and Connecticut state law, a claim for violation of the Constitution of the State of Connecticut, and Connecticut state law claims for intentional and reckless infliction of emotional distress.

The Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against the Plaintiffs as to all claims.  [Doc. #48].  The Defendants contend that there is an absence of a genuine issue of material

fact as the City of Hartford is entitled to municipal immunity, Sergeant Albert is entitled to qualified immunity, and the Plaintiffs cannot establish the required elements for their any of their claims.  For the reasons stated hereafter, the Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Specifically, summary judgment is granted in favor of the Defendants on the Plaintiffs' claims for intentional and reckless infliction of emotional distress. The Plaintiffs' remaining claims shall go forward to trial.

## I.  Factual Background

The following facts are undisputed for the purpose of the Defendants' motion for summary judgment unless otherwise noted.  On April 23, 2006, the Hartford Marathon Foundation, Inc. organized a "Red Nose Run" event that was held at the Mortensen Riverfront Plaza (the "Plaza") in Hartford, Connecticut.  The Plaza spans over Interstate 91 South of the Founders Bridge between the Connecticut River and Columbus Boulevard.  The Defendants contend that the Plaza is owned by the State of Connecticut and has been leased to the City of Hartford pursuant to a January 24, 1992 Airspace Lease Agreement.  The Plaintiffs in turn note that the lease of the property from the State of Connecticut is only the property which is within the "air space" over Interstate 91, and that the Defendants have failed to provide the "Airspace Lease Agreement" referenced in violation of Rule 56(e)(1) and Local Rule 56(3).  The Defendants also contend that the City has subleased the Plaza to Riverfront Recapture, Inc., pursuant to a lease agreement dated January 26, 1998, and that under the lease agreement, the City of Hartford had limited responsibilities, including the provision of police and other

2

customary public safety services, and that the Hartford Police Department's sole duty is to provide police protection.  The Plaintiffs again note that the Defendants have failed to provide the "Airspace Lease Agreement" referenced in violation of Rule 56(e)(1) and Local Rule 56(3).

The Red Nose Run is a community and family-oriented event held to promote the circus in anticipation of circus performances held in Hartford.  The event consists of a "race" for young children.  As a result, the attendees of the Red Nose Run are primarily families and young children.  For the event, the Red Nose Run organizers erected a tent at the Mortensen Riverfront Plaza that children and adults traveled in and out of during the event.

While the Hartford Marathon Foundation obtained a permit issued by the City of Hartford to use the Plaza for the Red Nose Run, the Plaintiffs note that the event was co-organized by Feld Entertainment, which they identify as the parent company to Ringling Brothers and Barnum and Bailey Circus.  The Plaintiffs also contend that Feld Entertainment paid all fees relating to the event.

The Plaintiffs, Derek V. Oatis and Lisa Zalaski, along with other members of the Animal Rights Front, Inc., attended the Red Nose Run at the Riverfront Plaza on April 23, 2006 for the purpose of protesting the use of animals in the circus. The Plaintiffs did not obtain a permit for their protest activities.

The parties dispute the nature of the Plaintiffs' protest activities.  The Defendants claim that the Plaintiffs "yelled at" event attendees, including children, during their protest.  Def. Loc. R. 56(a)(1) Statement ¶ 15.  The Defendants further contend that the Plaintiffs and other protestors "obstructed" pedestrian traffic,

3

and as a result, the Red Nose Run could not be conducted as planned.  Id. ¶ 16-17.

Believing that the Plaintiffs' demonstration posed a safety hazard, Kay Page

Greaser, the event organizer, called the police dispatcher and requested police

assistance.  She informed the dispatcher that the protestors were obstructing the

event.  Id. ¶ 18.

   The Plaintiffs contend, however, that they remained clear of the running

path of children and did not obstruct any attendees or participants.  Pl. Loc. R.

56(a)(2) Statement ¶ 1.  They further allege that the only reason that Ms. Greaser

wanted the Plaintiffs to move was because of the content of their message and

their viewpoint that the circus is harmful to animals.  Id. ¶ 2.  In support of their

claim, the Plaintiffs cite the following portions of Ms. Greaser's deposition

testimony:

> A:  Well, there are several ways to use the word "obstruction" in my
> opinion.  Obstruction can be physical.  It can also be mental, causing problems
> and/or feelings for the people that are trying to have a good time.
> Q:  So let me back up then.  In your direct examination I believe you stated
> that protestors obstructed the race itself.
> A:  U-huh . . .
> Q:  Did Mr. Oatis obstruct the race as you observed?
> A:  By being in a place that was in the way of conducting the race.
> Q:  Did you have these kids run up the stairs [where Mr. Oatis was
> standing]?
> A:  No . . .
> Q:  Was Mr. Oatis, when he stood on that step with his banner, the step to
> the registration tent, was he obstructing kids running?
> A:  No.
> Q:  So when you described that he was obstructing, you meant only access
> to the registration tent?
> A:  No.
> Q:  What else did you mean?
> A:  I meant he was obstructing the running of the race, because of the
> physical banner visually causing a problem with people who were trying to have a
> good time.

**Q:  Can you explain how he visually caused a problem with people trying to have a good time?**

**A:  Visually and orally.  I believe Mr. Oatis was talking quite a bit and yelling things, and was also holding a banner that had words on it that were probably not comfortable for the families.**

**Q:  How were the words not comfortable for the families?**

**A:  I don't remember.  I don't know.  I have no idea what the banner said . . .**

**Q:  So words that, for example, said please don't fund the circus would be inappropriate?**

**A:  If that's what it said, yes . . .**

**Q:  If his banner said Got Freedom – question mark – would that be inappropriate in your opinion?**

**A:  I'm going to . . . say yes to that, because I think any saying anything is inappropriate in that particular situation in front of the registration test.**

**Q:  So if he had a banner that said "have a good race kids" that would be inappropriate?**

**A:  No . . .**

**Q:  How was [Mr. Oatis's] banner inappropriate?**

**A:  Because it was obstructing the positive feeling of the race.**

**Q:  So when you say obstructing, you mean the message contained in the banner was contrary to the atmosphere of the event?**

**A:  Yes.**

**Q:  So the words – the meaning of the words was the obstruction in your opinion?**

**A:  Yes . . .**

**Q:  So did any other protestors obstruct the event race?**

**A:  No.**

**Q:  So Mr. Oatis and Ms. Zalaski and their banner were the only obstruction to the event?**

**A:  Correct.**

**Q:  And the only obstruction they made was blocking approximately five feet of a thirty-foot step, correct?**

**A:  Uh-huh.**

Pl. Exh. B, Greaser Dep., at 49-61.

In response to Ms. Greaser's call, Sergeant Daniel Albert, along with officers

Kevin Hart, Roger Kergaravat and Donald Rodrique, were dispatched to the Plaza.

Upon arriving at the Plaza, Ms. Greaser notified Sergeant Albert that the Hartford

Marathon Foundation had obtained a permit to use the Plaza for the Red Nose Run

and that the demonstrators continued to "obstruct."  Def. Loc. R. 56(a)(1)

Statement ¶ 21.  Sergeant Albert asked the demonstrators to relocate to an area several yards to the side of the location in which they were standing.  The Plaintiffs refused to move.  Sergeant Albert then told the Plaintiffs that if they did not move, they would be arrested.  When the Plaintiffs still refused to relocate, Sergeant Albert ordered Officers Kevin Hart and Donald Rodrigue to arrest them.

Officer Hart arrested the Plaintiffs and charged them with obstruction of free passage.  Sergeant Albert and Officer Hart claim that they believed probable cause existed to arrest the Plaintiffs for obstruction of free passage, criminal trespass, and disorderly conduct.  The Plaintiffs, on the other hand, assert that Sergeant Albert requested them to move and ordered their arrest because of their viewpoint and substantive message.  The Plaintiffs rely upon Sergeant Albert's deposition testimony, in which he acknowledged that he observed the Plaintiffs to be "well behaved" and "cooperative."  Pl. Exh. A, Albert Dep., at 54 and 88-89.  With respect to the Plaintiffs' "obstruction", Sergeant Albert testified as follows:

> Q:  So when you say blocking them, there was room to go around [the Plaintiffs]?
> A:  Yes.
> Q:  It's just that the marathon people didn't want them standing there?
> A:  Correct.
> Q:  But if people could go around them, how are they blocking?
> A:  They were partially blocking.
> Q:  So one individual standing there would be partially blocking?
> A:  Yes.
> Q:  If a newspaper reporter taking photographs was standing on those steps, they'd be blocking? . . .
> A:  - partially blocking.
> Q:  Could they be arrested?
> A:  No.

Pl. Exh. A, Albert Dep., at 60-61.

Since their arrest on April 23, 2006, both Plaintiffs have attended animal rights protests.  However, the Plaintiffs claim that, because of their arrests, they curtailed and ultimately caused their protests of the Red Nose Run for fear of subsequent arrest and because the Defendants' actions made their expressive conduct at these events difficult or impossible.  Pl. Loc. R. 56(a)(2) Statement ¶ 7.

## II.  Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).  "The moving party bears the burden of showing that he or she is entitled to summary judgment."  Huminski, 396 F.3d at 69.  "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with

7

evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

### III.  Discussion

### A.  First Amendment

The Plaintiffs allege that the Defendants deprived them of their First Amendment rights in violation of 42 U.S.C. § 1983 by threatening to arrest and arresting them based on their exercise of free speech and assembly.  The Defendants' main argument in support of their motion for summary judgment as to these claims is that the Riverfront Plaza was not a public forum, and therefore Sergeant Albert's arrest of the Plaintiffs was justified.

"Under the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a 'forum based' approach."  Hotel Employees & Restaurant Union v. City of New York Dept. of Parks and Recreation, 311 F.3d 534, 544 (2d Cir. 2002).  "As a general matter, the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon."  Id.

The first category of government-owned property is the "traditional" public forum, which is defined as a forum that has "traditionally been available for public expression" and has as "a principal purpose . . . the free exchange of ideas."  Id. (internal citations omitted).  Examples of public fora are streets, sidewalks, and parks.  Id.  Content-based restrictions on speech in such fora are subject to "strict

scrutiny," meaning that they "must serve a compelling government interest and be narrowly tailored to achieve that interest." <u>Id.</u> at 545.

The second category of government-owned property is the "designated" public forum, which is "a non-public forum that the government has opened for all types of expressive activity." <u>Id.</u> Restrictions on speech in designated public fora are constitutional only if they are "content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling state interest and (2) narrowly drawn to achieve that interest." <u>Id.</u> (internal quotation marks omitted).

The "limited" public forum is a subset of the designated public forum which exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." <u>Id.</u> "In limited public fora, strict scrutiny is accorded only to restrictions on speech that fall within the designated category for which the forum has been opened." <u>Id.</u> "Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." <u>Id.</u> at 545-46. If expressive activity does not fall within the limited category for which the forum has been opened, "restrictions need only be viewpoint neutral and reasonable." <u>Id.</u> at 546.

The third category of government-owned property consists of "property that the government has not opened for expressive activity by members of the public." <u>Id.</u> "The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality." <u>Id.</u> Examples of non-

public fora are airport terminals, military bases and restricted access military stores, jailhouse grounds, and the Meadowland Sports Complex.  Id.

Here, the Defendants argue that Riverfront Plaza is a non-public forum because it is owned by the State of Connecticut, leased by the State to the City of Hartford, and in turn subleased by the City to Riverfront Recapture, Inc., a private corporation.  Pursuant to the terms of the lease agreement, Riverfront Recapture receives revenue from events held on the Plaza and provides for the maintenance of the facility, and also provides its own park ranger service for the Plaza.  The City of Hartford provides limited utility and structural services for the Plaza, is not responsible for scheduling and organizing events at the Plaza, and provides only customary public safety services ordinarily provided to the public.

To establish these facts pertaining to the lease agreement, the Defendants rely solely upon the affidavit of David B. Panagore, Director of the Developmental Services Department for the City of Hartford.  See Def. Exh. 7.  However, the Defendants have failed to provide a copy of the lease agreement itself.  Thus, they have violated Fed. R. Civ. P. 56(e), which provides "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  In addition, the Plaintiffs have adduced evidence contradicting the Defendants' claim that the Plaza is a non-public forum.  Specifically, they rely upon the deposition testimony of Detective Wiebusch, who is the Hartford Police Department's Litigation Coordinator and the City's chosen representative for purposes of this litigation.  Detective Wiebusch expressly referred to sections of the Hartford Municipal Code addressing Hartford public parks when describing the

10

legal status of the Plaza.  See Pl. Exh. C, Wiebusch Dep., at 42-28 and 53-57.  She

further testified as follows:

> Q:  All right.  So this area that we're talking about, where the defendants
> [sic] were arrested, that's a City of Hartford park?
> A:  I guess there's a little confusion as to what it is, but it's under my
> understanding that it's run and maintained and that there's park rangers at River
> Front Recapture or Riverfront Plaza, which I believe is the location of the incident.
> And the exact details of who owns the property, I know that – it's my
> understanding that it is leased at some point to – from one agency to another.  The
> exact information I do not have.
> Q:  Is it a park?
> A:  I would consider it a park.
> Q:  Okay.  So a park like Keeney Park, which is mentioned specifically in
> this section [of the Municipal Code]?
> A:  Yeah.  Because it's an area where people can assemble, it's enjoyable,
> there's areas for them to walk.  They can walk down from it, they can walk down to
> Charter Oak Landing or Riverside Park, which is – I mean that whole front section
> there – and it's maintained by park rangers.  It's my understanding – it's my
> interpretation that it is a park.
> Q:  So if these demonstrators had been in Keeney Park on that day
> approaching pedestrians, asking them not to support the circus, and one of those
> pedestrians was annoyed, this section you cited would apply? . . .
> A:  Yes.

Pl. Exh. C, Wiebusch Dep., at 44-46.  In light of the Defendants' failure to provide

the lease agreement referred to in Mr. Panagore's affidavit along with Detective

Wiebusch's testimony suggesting that the Plaza is a "park," the Court is unable to

conclude as a matter of law that the Plaza is a public forum.

Moreover, assuming arguendo that the Defendants were able to establish

that the Plaza is a public forum, they would still not be entitled to summary

judgment on the Plaintiffs' First Amendment claims.  As noted above, even in non-

public fora, government restrictions on expressive activities are subject to "the

requirements of reasonableness and viewpoint neutrality."  Hotel Employees, 311

F.3d at 546.  Here, the Plaintiffs have adduced facts which may support a

11

reasonable jury's conclusion that Sergeant Albert arrested the Plaintiffs because of their viewpoint, and not because of their conduct.  Ms. Greaser admitted during her deposition that the Plaintiffs were "obstructing" the race in the sense that the Plaintiffs' message was "obstructing the positive feeling of the race."  Pl. Exh. C, Greaser Dep., at 55.  She further conceded that the "meaning of the words" on the Plaintiffs' banner constituted "obstruction."  Id. at 55-56.  The only physical obstruction that the Plaintiffs engaged in was blocking approximately five feet of a thirty-foot step.  Id. at 61.  Sergeant Albert spoke to Ms. Greaser when he arrived at the scene, and he relied upon her description of the protestors' activities in ordering them to move.  Furthermore, Sergeant Albert himself admitted during his deposition that event attendees had room to go around the Plaintiffs, and that the people running the marathon did not want them there.  See Pl. Exh. A, Albert Dep., at 60-61.  The deposition testimony of Ms. Greaser and Sergeant Albert suffice to create a genuine issue of material fact as to whether Sergeant Albert's order instructing the Plaintiffs to move and their subsequent arrest was based on their viewpoint rather than their conduct.

The Defendants argue in the alternative that, even if the Court determines that the Plaza is a limited public forum or traditional public forum, they would still be entitled to summary judgment because Sergeant Albert's conduct in arresting the Plaintiffs was content-neutral and narrowly tailored to serve a significant governmental interest.  The Defendants identify "crowd control" as the governmental interest that they sought to serve by ordering the Plaintiffs to move and subsequently arresting them when they failed to comply.  See Heffron v. Int'l

12

Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 653-54 (1981) (recognizing the government's interest in the orderly movement and control of persons at a fairground as a substantial government objective justifying content-neutral restrictions on expressive activities).  In support of this argument, the Defendants rely upon the Third Circuit's decision in Startzell v. City of Philadelphia, 533 F.3d 183 (2008).  However, Startzell is easily distinguishable from the present case.

In Startzell, a group of protestors at a gay pride event were arrested after they refused a request by police officers to move to another location.  533 F.3d at 191.  The district court rejected the protestors' First Amendment claim against the City of Philadelphia, holding that the City did not prohibit their speech based on its content, but rather imposed reasonable time, place, or manner restrictions that were content neutral, narrowly tailored, and allowed for alternative channels of communication.  Id. at 191.  On appeal, the Third Circuit affirmed the district court's grant of summary judgment in favor of the City.  In reaching its decision, the Third Circuit relied upon facts showing that the protestors used bullhorns and microphones in an attempt to drown out event speakers, congregated in the middle of the walkway leading to the stage, interfered with the event's activities by expressing their message with loud bullhorns right next to the main stage where musical performances were held, directly confronted a transgendered individual, and blocked access to the vendors who had applied for booths at the event.  Id. at 199.  The Third Circuit recognized that "[t]he right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event

covered by a permit." Id. at 198.  The Third Circuit found that the police action in instructing them to move and arresting them was based upon the protestors' conduct, rather than the content of the message.  Id.

Notably, the Startzell court expressly distinguished an earlier decision by the Sixth Circuit in Parks v. City of Columbus, 395 F.3d 643 (6th Cir. 2005).  In Parks, a demonstrator was removed from a nonexclusive Arts Festival which had a permit.  Id. at 646.  The Sixth Circuit found that the City's actions were based on the content of the demonstrator's speech, because "Parks was acting in a peaceful manner and the only difference between him and the other patrons was that he wore a sign communicating a religious message and distributed religious leaflets."  Id. at 653-54.  There was no evidence that Parks was interfering with or disrupting any part of the Arts Festival, but instead he was asked to move simply because the event sponsor did not want him there.  Id. at 654.

The facts before the Court on summary judgment suggest that this case is more analogous to Parks than to Startzell.  The Defendants have failed to produce evidence demonstrating that the Plaintiffs or other protestors disrupted or interfered with the Red Nose Run.  Instead, the facts show that they stood on a step in a location by which the children were running holding banners critical of the circus.  While Ms. Greaser claimed that they were "obstructing" event attendees, her deposition testimony suggests that by "obstruction" she meant that their message was interfering with the ability of event attendees to enjoy themselves, and not that they were obstructing the event in a physical sense.  As in Parks, it appears that the Plaintiffs and other protestors were asked to move

14

simply because Ms. Greaser did not want them there.  At the very least, her testimony creates genuine issues of material fact that render the Plaintiffs' First Amendment claims inappropriate for resolution on a motion for summary judgment.

The Defendants further argue that the Plaintiffs lack standing for their First Amendment claims because their arrests did not "chill" their exercise of their First Amendment rights.  To prevail on their First Amendment claims, the Plaintiffs must prove "(1) [they have] an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [their] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [their] First Amendment right."  Curley v. Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (citations omitted).  If the Plaintiffs fail to demonstrate "an actual, non-speculative chilling effect," there is no harm and therefore they lack standing.  See Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002).

The Defendants base their argument on the fact that both Plaintiffs admitted during their deposition that they have continued to attend animal rights protests following their arrests.  However, the Plaintiffs contend that they curtailed and then completely ceased their demonstrations at the Red Nose Run events as a result of their fear of subsequent arrest caused by the Defendants' conduct.  In addition, it is undisputed that the Plaintiffs were unable to continue their demonstration on April 23, 2006 as a result of their arrests.  Whether or not these facts are sufficient to demonstrate that the Plaintiffs were "effectively chilled" from exercising their First Amendment rights is a question of material fact to be

15

decided by the jury at trial.

**B. False Arrest, False Imprisonment, and Malicious Prosecution**

The Defendants argue that the Plaintiffs cannot recover on their claims for false arrest, false imprisonment, and malicious prosecution under 42 U.S.C. § 1983 or Connecticut law because Sergeant Albert had probable cause to arrest them for the charged offense of obstructing free passage as well as the uncharged offenses of disorderly conduct and interfering with a police officer.  As the Defendants' correctly note, a plaintiff cannot recover on a 42 U.S.C. § 1983 claim based upon false arrest, false imprisonment, or malicious prosecution if the arresting officer had probable cause for the arrest.  See Finigan v. Marshall, 574 F.3d 57, 61 (2d Cir. 57).  Likewise, to prevail on their state law claims for false arrest, false imprisonment, malicious prosecution, and violation of the Connecticut Constitution, the Plaintiffs must in each instance establish an absence of probable cause.  See Shattuck v. Town of Stratford, 233 F. Supp. 2d 301, 306-07 (D. Conn. 2002).

"In determining whether there was probable cause, [a court's] inquiry is an objective one that focuses on the facts available to the arresting officer at the time of the arrest."  Finigan, 574 F.3d at 61-61.  "Probable cause exists when, based on the totality of the circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'"  Id. at 62 (quoting Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007).  "Although probable cause generally

16

raises a fact-specific determination, '[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers.'"  Joyner v. Morales, No. 04 Civ. 569, 2005 WL 883327, at *2 (S.D.N.Y. Apr. 15, 2005) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

Based upon the facts and circumstances of this case, as further detailed below, the Court concludes that there are genuine issues of material fact regarding the existence of probable cause, and therefore that summary judgment would be inappropriate on this basis.

### 1.  Obstructing Free Passage

The law pertaining to Obstructing Free Passage is governed by Conn. Gen. Stat. § 53a-182a, which provides:

> (a) Unless a person is engaged in any activity which is expressive of rights guaranteed under the constitution of the United States or the constitution of this state, a person is guilty of obstructing free passage when, after being warned by a law enforcement officer not to do so, he (1) stands, sits or lies in or upon any public street, curb, crosswalk, walkway area, mall or the portion of private property utilized for public use, so as to obstruct unreasonably the free passage of pedestrians thereon, or (2) obstructs unreasonably or prevents free access to the entrance to any building open to the public.

Conn. Gen. Stat. §53a-182a (2009).  Thus, by its express terms, this statute has no application to individuals "engaged in any activity which is expressive of rights guaranteed under the constitution of the United States."  Here, the Plaintiffs have asserted that they were exercising their First Amendment rights at the time of their arrest.  The Court has already determined that there are genuine issues of material fact with respect to whether the Plaza was a public forum and whether the

17

Plaintiffs have demonstrated a violation of their First Amendment rights.

Moreover, Ms. Greaser admitted during her deposition that the Plaintiffs were

"obstructing" in the sense that the Plaintiffs' message was "obstructing the

positive feeling of the race."  Sergeant Albert spoke to Ms. Greaser when he

arrived at the scene and relied upon Ms. Greaser's description of the protestors'

activities in ordering them to move.  Furthermore, Sergeant Albert himself

conceded at his deposition that event attendees could easily go around the

Plaintiffs, which tends to confirm their allegation that they were not physically

obstructing the event.  This testimony creates questions of material fact as to

whether the Plaintiffs were arrested for expressing their First Amendment rights.

If the jury finds that the Plaintiffs were engaged in activity protected by the First

Amendment, no reasonable officer could have believed that there was probable

cause to arrest them for violation of Conn. Gen. Stat. § 53a-182a.

## 2.  Disorderly Conduct

The law pertaining to Disorderly Conduct is governed by Conn. Gen. Stat. §
53a-182, which states:

> (a) A person is guilty of disorderly conduct when, with intent to cause
> inconvenience, annoyance or alarm, or recklessly creating a risk thereof,
> such person:  (1) Engages in fighting or in violent, tumultuous or
> threatening behavior; or (2) by offensive or disorderly conduct, annoys
> or interferes with another person; or (3) makes unreasonable noise; or
> (4) without lawful authority, disturbs any lawful assembly or meeting of
> persons;  or  (5) obstructs  vehicular  or  pedestrian  traffic;  or  (6)
> congregates with other persons in a public place and refuses to comply
> with a reasonable official request or order to disperse…

Conn. Gen. Stat. § 53a-182 (2009).  The Defendants argue that the protestors were

acting with intent to cause inconvenience, annoyance or alarm, that they were

18

disturbing a lawful assembly and obstructing pedestrian traffic, and that they refused to comply with a reasonable official request to disperse.  However, the Court finds that there are questions of material fact as to whether the alleged intent to cause inconvenience, annoyance or alarm was the predominant intent of the Plaintiffs.  In addition, the Court again emphasizes that, in this case, a reasonable jury could find that by arresting the Plaintiffs in their peaceable protest of the circus, the arresting officer was interfering with the First Amendment rights of the protestors and, thus, was not acting reasonably.

In **State v. Indrisano**, the Connecticut Supreme Court found that "predominance can be determined either (1) from the fact that no bona fide intent to exercise a constitutional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise."  **640 A.2d 986, 993 (Conn. 1994)**.  As the **Indrisano** court recognized, **Conn. Gen. Stat. § 53a-182** cannot be applied to individuals if they were lawfully exercising their First Amendment rights.  **See id.** at 807 ("As reasonably construed, the statute does not prohibit the lawful exercise of any constitutional right.") (quoting **Colten v. Kentucky, 407 U.S. 104, 110 (1972)**). Again, if the jury finds that the Plaintiffs were lawfully exercising their First Amendment rights at the time of their arrest, no reasonable officer could have believed that there was probable cause to arrest them for violation of **Conn. Gen. Stat. § 53a-182**.

19

### 3.  Interfering with an Officer

Finally, the law pertaining to Interfering with an Officer is governed by

Conn. Gen. Stat. § 53a-167a, which provides:

> (a) A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer…in the performance of such peace officer's…duties.

Conn. Gen. Stat § 53a-167a (2009).  As discussed previously, there are questions of material fact with respect to whether the Plaintiffs were lawfully engaged in expression of their First Amendment rights at the time of their arrest.  If the Plaintiffs were lawfully exercising their First Amendment rights, they could not be deprived of those rights simply because they refused to obey an order to disperse.

See State v. Anonymous, 33 Conn. Supp. 93, 98 (Conn. Com. Pl. 1976) (holding that individuals "engaged in the lawful expression of their constitutional rights may not be deprived of those rights because they refused to obey an order to disperse"); State v. Anonymous, 34 Conn. Supp. 531, 534 (Conn. Sup. Ct. 1977) ("[A]n officer cannot be found to have been in the performance of his duties unless he was acting within the law at the time of the alleged interference"). Based upon the facts presented, the Court is unable to conclude as a matter of law that Sergeant Albert had probable cause to order the arrest of the Plaintiffs for violation of Conn. Gen. Stat. § 53a-167a.  In fact, Sergeant Albert unequivocally testified during his deposition that the Plaintiffs did not interfere with an officer:

> Q:  At the time you directed the arrest of Mr. Oatis and Ms. Zalaski, did you believe there was probable cause that they had committed a crime?
> A:  Yes.
> Q:  What crimes or crime did you believe they had committed?

20

A:  Possibly trespass, possibly obstructing free passage, possibly disturbing the peace, breach of peace, disorderly conduct.
Q:  Any others?
A: Not that I can recall right now.  *Interfering, but they didn't interfere. Everyone was cooperative* –
Q:  Okay.  Hold on.  Possibly interfering, but they didn't interfere?  Did you -
A:  Yeah.  I mean if we had to struggle with them or something.
Q:  Did you struggle with them?
A:  No.

Pl. Exh. A, Albert Dep., at 54 (emphasis added).  Thus, Sergeant Albert's own deposition testimony contradicts the Defendants' assertion that probable cause existed to arrest the Plaintiffs on the charge of Interfering with an Officer.

## C.  Qualified Immunity

The Defendants further argue that Sergeant Albert is entitled to qualified immunity with respect to the Plaintiffs' 42 U.S.C. § 1983 claims for damages against him.  Qualified immunity protects a "government official acting in an official capacity from suit for damages under § 1983 unless the official violated clearly established rights of which an objectively reasonable official would have known."  Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 358 (2d Cir. 2004); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right.  Id. at 201. Second, if the plaintiff satisfies the first step, the court must then decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  Id.

Subsequently, in Pearson v. Callahan, 129 S.Ct. 808 (2009), the Supreme

21

Court ruled that the Saucier approach for determining whether a government official is entitled to qualified immunity should no longer be considered mandatory.  Following Pearson, lower court judges are permitted to exercise their discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.  Id. at 817.  The Pearson Court observed, however, that the Saucier approach is often beneficial, such as in cases where it "may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be."  Id. at 818.

As the Defendants correctly state, in determining whether the Plaintiffs' First Amendment rights were clearly established at the time of the events in question, the Court must consider the nature of the Plaza as a forum and assess any limitations placed on the Plaintiffs' speech in light of the requisite standard for that forum.  See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  The Defendants argue that Sergeant Albert is entitled to qualified immunity because it is "far from clear what First Amendment rights plaintiffs were entitled to on the plaza," and therefore, it was objectively reasonable for the officers to believe that probable cause existed to arrest the Plaintiffs when they failed to comply with Sergeant Albert's request to move.  As the Second Circuit has explained, "[i]f facts supporting probable cause to arrest are ultimately found not to have existed, an arresting officer will nonetheless be entitled to immunity from suit based on 'arguable probable cause,' which requires that he or she show that it was objectively reasonable to believe that probable cause existed or that

'officers of reasonable competence could disagree on whether the probable cause

test was met.'" Finigan, 574 F.3d at 61 (quoting Escalera v. Lunn, 361 F.3d 737,

743 (2d Cir. 2004)).

As noted above, the Court has determined that there are genuine issues of

material fact with respect to the nature of the Plaza as a forum.  Specifically, the

nature of the forum is unclear in light of the Defendants' failure to provide the

lease agreement between the City and Riverfront Recapture, and further based

upon Detective Wiebusch's testimony suggesting that the Plaza is a "park."

Where, as here, facts material to the qualified immunity remain in dispute,

summary judgment is inappropriate.  See Hemphill v. Schott, 141 F.3d 412, 418 (2d

Cir. 1998) ("summary judgment based either on the merits or on qualified

immunity requires that no dispute about material factual issues remain"); Thomas

v. Roach, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified

immunity is not appropriate when there are facts in dispute that are material to a

determination of reasonableness.").

Moreover, even assuming that the Plaza is a nonpublic forum, Sergeant

Albert would still not be entitled to qualified immunity based upon the record

before the Court on summary judgment.  It is clearly established that individuals

have a First Amendment right to engage in protest activities.  As the Second

Circuit has explained:

> The Supreme Court has declared that the First Amendment protects
> political demonstrations and protests – activities at the heart of what the
> Bill of Rights was designed to safeguard.  See Boos v. Barry, 485 U.S.
> 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 33 (1988) (calling organized political
> protest "classically political speech" which "operates at the core of the

First Amendment").  Indeed, the Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder.

Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006); see also De Jonge v. Oregon, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to . . . free speech and . . . is equally fundamental.").  While an individual's First Amendment rights are limited when the forum at issue is a nonpublic one, they are not entirely extinguished.  To the contrary, the Second Circuit has held that, even in non-public fora, government restrictions on expressive activities are subject to "the requirements of reasonableness and viewpoint neutrality."  Hotel Employees, 311 F.3d at 546; see also Huminski, 396 F.3d at 92-93 (concluding that trespass notices issued to plaintiff constituted "an unreasonable restriction on [his] expressive activity in a nonpublic forum," and noting that "[s]uch broad restrictions are generally frowned upon even in nonpublic forums").

Here, there is sufficient evidence in the record from which a jury may conclude that no reasonable officer could have believed that there was probable cause to arrest the Plaintiffs.  If the jury accepts the Plaintiffs' version of the facts and determines that the Plaintiffs were merely engaged in peaceful protest and did not obstruct or interfere with the event in any way, and further that they were asked to move solely because of their viewpoint, an objectively reasonable officer could not have believed that there was probable cause to arrest them.  This is true even if the Plaza is found to be a nonpublic forum, because such a restriction on the Plaintiffs' expressive activities would be neither reasonable nor viewpoint

24

neutral.

### D.  Municipal Liability

The Defendants also argue that the City of Hartford is entitled to summary judgment because the Plaintiffs have failed to provide any facts to support municipal liability under the Supreme Court's decision in Monell v. Dep't of Social Services, 436 U.S. 658 (1978).  Pursuant to Monell, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Id. at 694.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983."  Id.  In order for the City to be held liable for the unconstitutional acts of its employees, the Plaintiffs must prove "that [their] constitutional rights were violated, that the alleged actions by the employees were the result of an official policy, custom, or practice of the municipal defendant, and that the policy, custom, or practice caused the alleged injuries."  Albert v. City of Hartford, 529 F. Supp. 2d 311, 329 (D. Conn. 2007) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

The Plaintiffs may demonstrate a "policy, custom or practice" in one of four ways:  "(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the [Plaintiffs'] civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive notice knowledge of

policy-making officials; or (4) a failure by official policy makers to properly train or supervise subordinates to such an extent that it amounts to a deliberate indifference to the rights of those with whom municipal employees will come into contact." Albert, 529 F. Supp. 2d at 329 (internal citations omitted).

The Plaintiffs first argue that summary judgment is inappropriate because the actions to which they object were taken by an official responsible for establishing municipal policy. In order for the City to be liable on this basis, the official must have "final policymaking authority." City of St. Louis v. Praprotnik, 485 U.S. 112, 113 (1988) (citing Pembauer v. Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion)). Whether a particular municipal official has "final policymaking authority is a question of state law." Id. at 124. Here, the Defendants' answers to interrogatory questions asking them to identify who had final decision-making authority to act on behalf of the City of Hartford named only Sergeant Albert. See Pl. Exh. D, ¶ 4; Pl. Exh. E, ¶ 4. Thus, the Plaintiffs argue, they do not have the burden at this stage of showing that Sergeant Albert had final decision-making authority because the Defendants have made no factual assertions to contradict the allegations made in their Complaint. However, the Supreme Court has made clear that the issue of whether a particular municipal official has final policymaking authority "is a question of state law." Praprotnik, 485 U. S. at 113.

The Plaintiffs have not cited any state law granting final policymaking authority to Sergeant Albert with respect to the actions in question. Instead, they appear to rely solely upon his discretionary authority to direct officers to make arrests. The Second Circuit has "explicitly rejected the view that mere exercise of

discretion was sufficient to establish municipal liability." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003). In Anthony, the Second Circuit held that the City was not liable for the actions of an NYPD sergeant in ordering his officers to seize and hospitalize a non-violent disabled individual because he was not a final decision-maker and therefore his order did not constitute an official municipal policy. Id. at 139-140. Similarly, in the instant case, Sergeant Albert cannot be considered to be a final decision-maker simply because he possessed the discretion to direct Officer Hart to arrest the Plaintiffs.

The Plaintiffs further argue that summary judgment is inappropriate because the Defendants admitted during the course of discovery that the City provided no training to its officers regarding the rights of individuals engaged in expressive activities, and that Officer Hart's arrest of the Plaintiffs was consistent with City policy and procedure. In making this argument, the Defendants rely upon the deposition testimony of Detective Wiebusch, who is the Hartford Police Department's Litigation Coordinator and the City's chosen representative for purposes of this litigation. Detective Wiebusch testified that Officer Hart's arrest of the Plaintiffs was "consistent with Hartford policy and procedures." Pl. Exh. C at 59-60. Detective Wiebusch further testified that she would not have charged the Plaintiffs with Obstructing Free Passage because, in her view, it appeared that they were engaging in conduct protected by the Constitution. Id. at 65-66. Officer Hart also testified that his arrest of the Plaintiffs and his view of their First Amendment rights was "based on my training and experiences as a police officer." Pl. Exh. H at 46.

27

The deposition testimony of Detective Wiebusch and Officer Hart creates questions of material fact with respect to whether the Plaintiffs were arrested pursuant to official City policy.  Detective Wiebusch's statement that she would not have charged the Plaintiffs with Obstructing Free Passage because it appeared that they were engaging in constitutionally protected conduct may be viewed as a concession that they were inappropriately arrested on this charge. Combined with her and Officer Hart's testimony that the arrest was consistent with City policy and procedure, this statement raises a question as to whether the City had a policy of arresting individuals for exercising their constitutional rights. Furthermore, because Officer Hart testified that his arrest of the Plaintiffs and his view of their constitutional rights was consistent with his training, there is a question of material fact as to whether the City failed to properly train its officers and, if so, whether that failure rose to the level of deliberate indifference to the constitutional rights of the public.  See Russo v. City of Bridgeport, 479 F.3d 196, 212 (2d Cir. 2007) ("[T]he City has admitted . . . that 'all individual defendants . . . acted toward the Plaintiff in accordance with custom, policy and practice.'  We understand this to constitute an admission that, if [the defendant police officers] are ultimately held to have violated [the plaintiff's] constitutional rights, then municipal liability against the City will be appropriate as well.").  Accordingly, summary judgment is denied as to the Plaintiffs' claims against the City.

### E.  Intentional and Reckless Infliction of Emotional Distress

Finally, in the fifth and sixth causes of action of their Complaint, the Plaintiffs have alleged that the Defendants "intended to inflict severe emotional

28

distress, or . . . knew or should have known that their actions would inflict severe emotional distress," and "recklessly inflicted severe emotional distress upon the Plaintiff[s]."  Compl. at 10-11.  The Defendants move for summary judgment on these claims, arguing that the conduct of the arresting officers was not "extreme and outrageous."

As a preliminary matter, the Court notes that Connecticut courts have not conclusively determined whether a separate cause of action exists under Connecticut law for reckless infliction of emotional distress.  See Montanaro v. Baron, No. CV065006991, 2008 WL 1798528, *3-4 (Conn. Super. Ct. Mar. 28, 2008). However, as discussed in Montanaro, while Connecticut appellate courts have not directly addressed the issue, several decisions implicitly suggest that there is no distinct claim for reckless infliction of emotional distress.  See Carrol v. Allstate Ins. Co., 262 Conn. 433, 451-52, 815 A.2d 119 (2003); Petitte v. DSL.net, Inc., 102 Conn. App. 363, 374 n. 2, 925 A.2d 457 (2007); Olson v. Bristol, 273 Conn. 914, 870 A.2d 1083 (2005); Benton v. Simpson, 78 Conn. App. 746, 756-57, 829 A.2d 68 (2003).  Based upon these decisions, the Montanaro court concluded that there is no distinct cause of action for reckless infliction of emotional distress, and that such a claim is encompassed by a claim for intentional infliction of emotional distress.  2008 WL 1798528, at *5.  This Court agrees with the Montanaro court's analysis of Connecticut law.  Accordingly, the Plaintiffs' claim for reckless infliction of emotional distress is dismissed, as the Plaintiffs have also asserted a claim for intentional infliction of emotional distress, which encompasses their recklessness claim.

The Court turns now to the Plaintiffs' claim for intentional infliction of emotional distress. To prevail on such a claim, a Plaintiff must prove:

> (1) that the actor intended to inflict emotional distress, or knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe.

Appleton v. Bd. of Educ., 757 A.2d 1059 (Conn. 2000) (citing Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)); see also Benton v. Simpson, 78 Conn. App. 746, 753, 829 A.2d 68 (2003); Massey v. Town of Windsor, 289 F. Supp. 2d 160, 165 (D. Conn. 2003); Kilduff v. Consential Inc., 289 F. Supp. 2d 12, 21 (D. Conn. 2003). Further, the Plaintiff must show that the Defendant's conduct "exceeds all bounds usually tolerated by decent society" and is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Appleton, 254 Conn. at 211, 757 A.2d 1059.  The actions of the Defendants "cannot be merely rude, tactless or insulting." Garris v. Dep't of Corr., 170 F.Supp.2d 182, 189 (D. Conn. 2001).  As a matter of law – absent other factors that may constitute "extreme and outrageous" conduct – an arrest will not be considered intentional infliction of emotional distress if the arresting officer has probable cause to make the arrest.  See Winter v. Northrop, No. 3:06cv216, 2008 WL 410428, at *6 (D. Conn. Feb. 12, 2008); Blalock v. Bender, No. 3:04CV1519, 2006 WL 1582217, at *6-7 (D. Conn. June 1, 2006).

The Plaintiffs have made no allegation, nor are there genuine issues of material fact, that the Defendants intended, knew, or should have known that a

routine arrest would lead to emotional distress on the part of the Plaintiff, or that the Defendants' conduct was extreme and outrageous.  They have failed to allege or identify any behavior whatsoever on the part of the Defendants that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Appleton, 254 Conn. at 211.  In addition, the Plaintiffs have failed to produce any evidence that they sustained "severe" emotional distress as a result of their arrests.  Therefore, they cannot satisfy the standard for intentional infliction of emotional distress, and summary judgment is granted in favor of the Defendants on this claim.

### III.  Conclusion

Based upon the above reasoning, the Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Plaintiffs' claims for intentional and reckless infliction of emotional distress are dismissed.  The Plaintiffs' remaining claims shall go forward.  A separate order will be issued scheduling this case for trial.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 31, 2010.

31