UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LISA ZALASKI,                                          :
ANIMAL RIGHTS FRONT, INC., AND          :
DEREK OATIS                                          :
    PLAINTIFFS,                                     :
                            : CIVIL ACTION NO. 3:08cv601(VLB)
                            :
    v.                                                  : JANUARY 18, 2012
                            :
CITY OF HARTFORD AND                         :
SERGEANT ALBERT                               :
    DEFENDANTS.                                    :

**MEMORANDUM OF DECISION AFTER TRIAL TO THE COURT**

I.    **Introduction**

      The Plaintiffs, Lisa Zalaski ("Zalaski"), Derek V. Oatis ("Oatis") and Animal

Rights Front, Inc., ("ARF") initiated this action pursuant to 42 U.S.C. §1983

against the City of Hartford (the "City") and Sergeant Daniel Albert ("Albert") in

connection with Zalaski and Oatis's arrest by members of the City of Hartford

Police Department and Defendant Albert during an April 23, 2006 animal rights

protest at the Hartford Marathon Foundation, Inc.'s Red Nose Run event ("Red

Nose Run" or "Event").  The Plaintiffs presented evidence at trial in support of

five claims.   These claims were that Defendant Albert's actions violated Plaintiffs'

First Amendment rights to free expression and assembly, and secondly of their

right to free speech under Article First, §§ 4 and 14 of the Connecticut

Constitution.  They also presented evidence in support of their claims of unlawful

retaliation in violation of the First Amendment; false arrest in violation of the

Fourth Amendment; and malicious prosecution in violation of the Fourth

Amendment.  Defendant Albert offered evidence namely that Plaintiffs' arrests were supported by probable cause and that he is entitled to the protection of qualified immunity.

II.   **Background**

   a. *Allegations in the Complaint*

Plaintiffs filed their complaint on April 21, 2008 consisting of a litany of facts all of which were incorporated into six causes of action against the City of Hartford and Defendant Albert.  Specifically, the complaint alleges that Plaintiffs were protesting the abuse of circus animals during the Red Nose Run event held at the Mortensen Riverfront Plaza (the "Riverfront Plaza" or "Plaza") which was a children's run event celebrating the circus coming to Hartford.  Plaintiffs broadly allege that Defendants arrested Plaintiffs without probable cause and in violation of Plaintiffs' First Amendment rights to free speech after they declined to move from the area in which they were demonstrating in to another area in Riverfront Plaza as requested by Defendant Albert. *See* [Dkt. #1, Complt. at ¶¶ 1-10].

In the first cause of action, Plaintiffs alleged that "Defendants excluded the Demonstrators from an area owned by the City of Hartford and historically held open for public use" and that "by its arrests and threats to arrest the Demonstrators based on their future exercise of free speech and assembly, Defendants have imposed a prior restraint on the Demonstrators in violation of their First Amendment Right to expression and assembly upon a public forum." [Dkt. #1, Pl. Compl. at ¶¶18-24].  Although, Plaintiffs have alleged a single cause

of action with respect to the First Amendment in the complaint, the pleadings and submissions both before and at trial from both parties suggest that Plaintiffs are asserting two separate causes of action under the First Amendment.  First, generally that Defendant's actions abridged their right to free speech under the First Amendment, and second, that Plaintiffs Zalaski and Oatis were arrested in retaliation for the exercise of their First Amendment rights.  The Defendant introduced evidence in defense of both claims at trial and did not object to the admission of evidence in support of either claim at trial.

In the second cause of action, Plaintiffs alleged that Defendant City of Hartford was liable for the violation of Plaintiffs' First Amendment rights on the basis that "Defendant Albert, in taking these actions described [t]herein, had final decision-making authority to act on behalf of the Defendant City of Hartford" and that these "actions were taken pursuant to official policy of the Defendant City of Hartford." [Dkt. #1, Pl. Compl. at ¶25].

In the third cause of action, Plaintiffs alleged that "Defendant Albert, falsely and maliciously and without probable cause, provocation or warrant, ordered the arrest [of] the Plaintiffs on a purported charge of obstructing free passage in violation of Connecticut General Statutes Section 53a-182a."  [Dkt. #1, Pl. Compl. at ¶¶20-29].  Plaintiffs alleged that the charges against them were dismissed on May 2, 2006.

In the fourth cause of action, Plaintiffs alleged that the "actions of the Defendants violated Plaintiffs' rights as secured by the Constitution of the State of Connecticut." [*Id.* at ¶26].

In the fifth and six causes of action, Plaintiffs alleged that Defendants engaged in the intentional infliction of emotion distress and the negligent infliction of emotional distress. [*Id.* at ¶¶30-33].

### b. Procedural Background

On March 31, 2010, the Court denied in part and granted in part Defendants' motion for summary judgment. *See* [Dkt. #61]. The Court granted summary judgment on Plaintiffs' intention and negligent infliction of emotional distress claims and denied summary judgment as to Plaintiffs' other claims. The Defendants then appealed the Court's denial of summary judgment. On May 26, 2011, the Second Circuit dismissed the appeal for lack of appellate jurisdiction. The Court then entered a scheduling order directing the parties to prepare for trial in December of 2011.

On November 16, 2011 in preparation for and to clarify the issues to be decided at trial, the Court ordered the Plaintiffs to provide the Court with a brief statement articulating with specificity the basis of its claim that Defendants' actions were taken pursuant to a municipal policy or custom and what facts Plaintiffs intend to prove to support its claim. *See* [Dkt. #137]. In response, Plaintiffs stated that they did not intend to pursue the claim that Defendant Albert had final decision-making authority at trial and indicated that they intended to

4

demonstrate a municipal policy or custom through a failure to train.  *See* [Dkt. #145].  Defendants responded that since the complaint contained no allegations whatsoever regarding training, the complaint failed to allege a plausible *Monell* claim.  Defendants argued that such claim should not be allowed to proceed to trial.

On December 1, 2011, four days before the start of trial, Plaintiffs moved to amend/correct the complaint to delete the prior allegation that Defendant Albert had final-policy making authority and instead assert a single new allegation that there was a "a failure to train by the Defendant City of Hartfrod [sic]."  *See* [Dkt. #154, Attach 2, Pl. proposed amended complaint at ¶ 25].  Defendants opposed Plaintiffs' motion to amend the complaint on the basis of prejudice and in the alternative moved to dismiss the proposed amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  The Court denied the motion to amend and granted the motion to dismiss finding that the proposed amended complaint failed to allege facts which stated a plausible claim for entitlement with respect to municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, (1978).  See [Dkt. #161].

III.   <u>Findings of Fact</u>

As a preliminary matter, the parties, in their joint trial memorandum, stipulate to the following facts.  On April 23, 2006, the Hartford Marathon Foundation, Inc. organized a Red Nose Run event that was held at the Riverfront Plaza in Hartford Connecticut.  [Dkt. #120, Joint Trial Memorandum at 11-12].  The Plaza spans over Interstate 91 South of the Founders Bridge between the Connecticut River and Columbus Boulevard.  [*Id.*].

The Red Nose Run is a community and family-oriented event held to promote the circus in anticipation of circus performances held in Hartford.  [*Id.*]. The event consists of a "race" for young children.  As a result, the attendees of the Red Nose Run are primarily families and young children.  [*Id.*].  For the event, the Red Nose Run organizers erected a tent at the Riverfront Plaza that children and adults traveled in and out of during the event.  [*Id.*].  While the Hartford Marathon Foundation obtained a permit issued by the City of Hartford to use the Riverfront Plaza for the Red Nose Run, the event was co-organized by Feld Entertainment, which is the parent company to Ringling Brothers and Barnum and Bailey Circus. [*Id.*].

The Plaintiffs, Oatis and Zalaski, along with other members of ARF attended the Red Nose Run at the Riverfront Plaza on April 23, 2006 for the purpose of protesting the use of animals in the circus.  The Plaintiffs did not obtain a permit for their protest activities. [*Id.*].

Sergeant Albert, along with officers Kevin Hart, Roger Kergaravat and Donald Rodrique, were dispatched to the Riverfront Plaza.  [*Id.*].  Upon arrival, Ms. Kay Page Greaser notified Albert that the Hartford Marathon Foundation had obtained a permit to use the Riverfront Plaza for the Red Nose Run and that the demonstrators continued to obstruct. [*Id.*].

Albert ordered Officer Hart to arrest Oatis and Zalaski.  Oatis and Zalaski were handcuffed, placed in a police car and transported to lock up for detention

and processing.  The charges against Oatis and Zalaski were dismissed on May 2, 2006.  [*Id.*].

Based on the testimonial and documentary evidence introduced at the trial the Court finds the following additional facts to have been proven by a fair preponderance of the evidence.[1]

Beth Shluger is the CEO and Executive Director of the Hartford Marathon Foundation, Inc. (the "Marathon Foundation"),  a non-profit organization which sponsors events to promote fitness and health such as organizing marathons, triathlons and duathlons.  Shluger was approached by Kay Paige Greaser the President of Large & Page Communications, Inc. a public relations firm about the Red Nose Run event.   Greaser's client was Feld Entertainment the parent company to Ringling Brothers and Barnum and Bailey Circus and the sponsor for the Red Nose Run.   Greaser contracted with the Marathon Foundation to co-organize the Red Nose Run.  The Marathon Foundation was responsible for the planning, implementation and logistics for the race portion of the event.  Greaser and Shluger worked together to plan and execute the event and were the primary event organizers.

The Red Nose Run was held at the Mortensen Riverfront Plaza.  The Riverfront Plaza is owned by the City of Hartford but leased to Riverfront Recapture, Inc., a private non-profit organization, which was created in 1981 to

---

[1]     Where helpful, the Court has provided references to documentary evidence, however, all factual findings are based on the Court's review of the admissible evidence presented.

restore public access to the Connecticut River.  Pursuant to the Lease Agreement, Riverfront Recapture, Inc. ("Riverfront Recapture" or "RRI") manages and operates Mortensen Riverfront Plaza.  *See* Defendant's Ex. D.  Joseph Marfuggi has been the President and CEO of Riverfront Recapture for 25 years. Marfuggi testified that Riverfront Recapture is responsible for raising money to fund, develop, design and manage the parks and recreation space along the Connecticut River for the city of Hartford and the town of East Hartford.  His testimony is corroborated by the Lease Agreement as discussed more fully below.  Riverfront Recapture hosts a wide variety of cultural and sporting events at its parks.  In addition, Riverfront Recapture will also host private events such weddings, receptions and charity walks.  Marfuggi testified that the general public uses the Plaza for recreation and that the Plaza contains benches for people to sit and read.  Marfuggi also testified that the Plaza is generally open to the public.

The Lease Agreement between the City of Hartford and Riverfront Recapture provides that the City of Hartford and Riverfront Recapture "wish to generate active and passive uses of the Riverfront Park for the general public." Section 2.8 expressly states that "[r]esidents of the City shall retain the same access to Riverfront Park as such residents had before this Agreement was executed, except as otherwise provided."  *See* Defendant's Ex. D. at Section 2.8. The Lease also provides that Riverfront Recapture "shall promote, organize and implement, directly or by contract, concessions and attractions, such as cruise boats, water taxis … and private events."  *See Id.* at Section 2.2(b).  In addition, the Lease states that "RRI may impose and collect fees for events or activities for

particular groups or persons which are not open to the public.  Such fees and charges shall be a source of revenue for RRI to defray in part the costs of managing and promoting the use of Riverfront Park and the costs of any maintenance services for the event or activity.  Any such event or activity shall be limited to a designated area of the Riverfront Park."  *Id.* at Section 2.9(c).

Under the Lease Agreement, the City retains the "authority to grant any permits required for activities or special events located within its boundaries, whether sponsored by the City, RRI or other person or entity" and that the "City will continue to waive all permit charges for activities and special events sponsored by RRI and which are open to the public."  *See* Defendant's Ex. D. at Section 2.7.   In addition, the City's permit application states that "certain events are eligible for a fee waiver of up to 50%" and that "[c]onsideration for a fee waiver is based on the cost for city services to support the event, the organization sponsoring the event, and the goals of the sponsor."  *See* Defendant's Ex. C at p. 13.  The permit application expressly notes that "[f]undraisers for another organization may not be eligible for a fee waiver."  *Id.*

Mortensen Riverfront Plaza is elevated over Interstate Highway 91 and can be accessed from a set of stairs at the corner of Columbus Blvd and State Street in Hartford, Connecticut.  At the entrance, there are signs indicating that one is entering a "Riverfront Recapture Park."  *See* Plaintiffs' Ex. 2b(1).  There is also a sign stating "Welcome to Mortensen Riverfront Plaza – the centerpiece of the Riverfront parks."  *See* Plaintiffs' Ex. 2b(5).  From the set of stairs, there is a paved walkway leading out to the riverfront.  One side of the walkway is bordered

9

by a concrete wall that also functions as a bench.  Behind the concrete wall/ bench there is a row of trees.   The other side of the walkway is bordered by an area of grass and trees.  There are stand-alone benches located in the grassy area.

Prior to reaching the river, the walkway bends towards the left and proceeds to a bridge which provides a path over the Connecticut River.  At the point where the walkway bends to the left, the concrete wall/ bench ends and there is a triangular raised patio which borders the walkway on the right.  The patio is raised several feet above the walkway.  There are three steps leading up to the patio from the walkway.  *See* Plaintiffs' Ex. 2c(9).  The triangular patio is bordered on two of its sides by a wrought-iron fence and only one side of the patio faces and is open to the walkway.  The area of grass and trees bordering the other side of the walkway increases in size where the concrete wall/bench ends and the raised patio begins.

The Red Nose Run was a fundraiser for the Boys and Girls Club of Hartford.  The event was attended by approximately 300 people, 200 of which were children, some of whom were as young as four.  It consisted of a series of races for children.  There was a 50 yard dash, a quarter mile, a half mile and then a mile run.  There were different races of each length devoted to a particular age group.  Racers were permitted to run in multiple races.  The first race was scheduled to begin at 1:00pm.  The event organizers had secured permission to erect a tent on the raised patio area in the Plaza.   The tent was the central gathering place for attendees.  It was the location where participants would

10

register for the race or sign in.   After each race was completed, prizes and food were distributed from the tent to the race participants.  The event organizers also invited the radio station Hot 93.7 to be at the event and provide music for the participants.

All of the races began towards the entrance to the Plaza by the steps leading up from Columbus Blvd.  The children would run down the walkway towards the riverfront and would run past the triangular raised patio where the registration tent was located and on towards the bridge that crossed the Connecticut River.  Many of the same children participated in multiple races. After one race was completed, the children and parents would congregate back towards the beginning of the Plaza to line up for the start of the next race.  After the races were completed, the children and parents would proceed to the registration tent for the food and prizes that were been handed out.

ARF is a small non-profit animal rights organization whose mission is to secure the fundamental rights of every animal to live a life independent of human abuse.   ARF was founded by William Manetti in 1982 and incorporated under the laws of Connecticut as a 501(c)(3) non-profit corporation.  Plaintiffs Zalaski and Oatis are long standing members of ARF.   The following five members of ARF protested at the Red Nose Run: Plaintiff Zalaski, Plaintiff Oatis, Karen Laski, William Manetti and Arlene Corey.  Karen Laski videotaped about 20 minutes of the Red Nose Run event.  The video recording is not continuous in time.  *See* Plaintiffs' Ex. 1.  The members of ARF were present at the Red Nose Run event

for approximately one hour.  They arrived at the event shortly after noon and were present before the first race began.

Plaintiffs' speech at the Red Nose Run event expressed their belief that the circus's use and treatment of animals is cruel and abusive.  Plaintiffs held a 6 feet by 4 feet banner which stated "Got Freedom? The Animals' Don't…."  *See* Plaintiffs' Ex. 2b(11).  William Manetti and Arlene Corey held a comparably sized banner stating "The Saddest Show on Earth" and depicting an elephant crying. *See* Plaintiffs' Ex. 2b(8).  William Manetti was also holding a separate smaller sign stating "Animal Abuse….Boycott Animal Circuses" with the depiction of three elephants standing on drums.  Arlene Corey was dressed as a "sad clown" at the event.  William Manetti testified that ARF members would occasionally dress as "sad clowns" at circus protests to convey their belief that circuses are sad places for the animals.

Karen Laski, who was recording the video of the event, and Plaintiff Zalaski can be heard on the video expressing the following statements to passersby and participants of the event: (1) "teach your kids compassion instead of cruelty," (2) "circus is a dirty word nowadays," (3) "children learn nothing about animals through the circus, they learn domination and cruelty, teach your children compassion not cruelty," (4) "don't sponsor cruelty," (5) "cruelty is not entertainment," (6) "have a compassionate marathon," (7) "a marathon that teaches children compassion not cruelty," (8) "think of something better to do Hartford Marathon Group, you can do better than this," (9) "you can do much better than this and you know it," (10) "that's real good music for kids.  No

12

kidding jesh. You want to listen to 92.7," (11) "Ringling just wants to sell tickets that is the only reason they are here," and (12) "children love animals they don't want them to suffer."  *See* Plaintiffs Ex. 1.

During the Red Nose Run, several other animal rights protestors unrelated or unaffiliated with ARF were also present.  Several protestors holding People for the Ethical Treatment of Animals ("PETA") signs were present as well as members of another small local animal rights group.

Upon arriving at the red nose run event, Manetti and Corey decided to stand with their banners in the corner where the concrete wall /bench ended and the triangular raised patio began.   Their position was tucked into the corner of the walkway just before the steps of the raised patio began and where the walkway began to bend leftwards.  Zalaski and Oatis decided to stand with their banner in front of the steps of the raised patio immediately adjacent to the entrance of the registration tent which was just three steps up on the patio.  Since the banner that Zalaski and Oatis were holding was approximately 6 feet by 4 feet, Zalaski and Oatis were occupying a significant width of the stairs leading to the raised patio area.  Zalaski testified that she thought that this location in front of the raised patio was "ideal" as their banner would be in the direct line of sight of the children running in the race and to anyone walking towards the riverfront down the walkway.

 Ms. Greaser received complaints from several participants in the Red Nose Run about the animal rights protestors.  Ms. Greaser then asked Oatis to relocate

from his position in front of the steps to the raised patio.  Oatis refused to move.
Ms. Greaser then asked a park ranger to speak with all the animal rights
protestors at the event.  The other animal rights protestors unaffiliated with ARF
complied with the Park Ranger's request and they lined up along the grassy
border on the other side of the walkway from the raised patio area.  Oatis again
refused to move after speaking with the park ranger.  Oatis and Zalaski remained
in front of the steps leading up to the registration tent while Manetti and Corey
remained in the corner where the patio begins and the concrete wall ends.  Ms.
Greaser then called the Hartford Police Department.

Defendant Albert, who was a Sergeant with the Hartford Police Department
at the time of the incident, responded to the dispatch.  When he arrived at the
Plaza, he encountered Ms. Greaser and Ms. Shluger who informed him that they
had a permit for the Plaza.  Ms. Shluger and Ms. Greaser explained that they were
holding a children's run and that some of the animal rights protestors were
obstructing the raised patio which held the registration tent.  Albert then
approached Oatis as he appeared to be the leader of the protestors and the focal
point.

Plaintiffs' video footage begins at some point during this initial encounter
between Albert and Oatis.  *See* Plaintiffs' Ex. 1.  The video footage begins with
Oatis giving his card to Defendant Albert and identifying himself as an attorney.
Oatis tells Albert that he doesn't know how they are interfering with the event.  He
tells him that "we haven't moved from the place we are in now, we are not
blocking pedestrian traffic and this a public walkway…we don't have to get off the

sidewalk.  The sidewalk is public property…Believe me I am making sure we are standing where we need to stand.  If we are not then I will direct people to move."  Albert requests that Oatis and Zalaski move up on the stairs.

Beth Shluger then expresses concern with Albert's request that they move up onto the stairs.   Shluger states "no they cannot be on the stairs, this is our registration area, they can be over there" while pointing to the grassy border section of the Plaza where the other animal rights protestors are standing.   In response, Oatis states that they will stand up against the walkway.   Shluger takes concern with Oatis's suggestion and explains that she is going to have kids starting down the walkway and running across that area.  She tells Oatis that "you need to just not be on the pavement."   Defendant Albert also states that "the kids are having a race here" in response to Oatis's suggestion that they stand up against the walkway.

Oatis then says he is going to stand on the steps since this is still a public area.  He tells Shluger that "you have a permit to be here but you don't have a right to exclude the public from being here."  Shluger tells Oatis that "I am just asking you to work with me" and Oatis responds that "I am too."   Shluger again asks Oatis to stand on the other side of the walkway on the grassy border.  Albert also asks them to move to that area and states "how about over there that is where they were going to go in the first place."  Oatis responds that he needs people to read the signs and that he wants to get their fronts and eyeballs not their backs.   Shluger responds they will still be facing all the people if they moved across the walkway.  Oatis disagrees and argues that since the people will

be running down the walkway that he wants them seeing the signs when they come.  Oatis promises that they will not get in the way and states that "the last thing we are going to do is have some kids trip on each other" or "have something bad happen."   Greaser states that we need this "whole space to sign up and line up." Albert then notes to Oatis that Shluger and Greaser have a permit which allows them to use that area for the tent.  Sometime during this initial conversation, Oatis and Zalaski move up to stand on the first step leading up to the raised patio.  The video does not appear to capture the end of Albert and Oatis's initial conversation.

Albert testified that after initially speaking with Greaser, Shluger and then Oatis he was not sure how the event was going to unfold.   He was not sure of how the races were going to work and how the event would play out.  He testified that after his initial conversation with Oatis, he did not request that Oatis and Zalaski move off the steps at that point.  He was "slow to act" because he wanted to observe the event to assess how the event would function and determine the appropriate course of action under the circumstances.  Albert testified that he was concerned with accommodating the protestors' rights to demonstrate as well as the event organizers rights, including their right to conduct the permitted event.   Albert testified that after watching the first wave of races, he came to a better understanding of how the event would function and understood that after the races ended the children and their parents would be coming back and congregating at the registration tent.  Albert testified that he was concerned that more and more people would be coming into the raised patio area to reach the

registration tent as the races ended.  Albert observed that after the first children's race ended more people were moving into the registration tent area.  He also observed children and their parents walking around Oatis, Zalaski and the banner they were holding to reach the registration tent.

After the quarter-mile run had begun, Albert approached Oatis and Zalaski and asked them to move off the steps away from the registration tent where the children and their parents were beginning to congregate and relocate to the other side of the walkway on the grassy border where the other protestors were standing.   At this point, Zalaski and Oatis had moved up onto the second step of the raised patio area and were standing just one step below the registration tent. They are standing immediately adjacent to the entrance of the registration tent and were occupying a significant width of the stairs leading to the raised patio area.  Albert testified that he spoke with Oatis for approximately five minutes and that he asked him three or four times to move.  When Oatis and Zalaski refused to move, Albert instructed Officer Hart to arrest them.  Plaintiffs' video only recorded the very end of Albert's interaction with Oatis and Zalaski and did not capture any of the conversation between Albert and Oatis leading up the arrest.

On the video recording, Defendant Albert maintains a calm demeanor throughout his entire encounter with the Plaintiffs including throughout the arrest.  His tone of voice is respectful and composed.  Plaintiff Zalaski also testified that Defendant Albert was polite and courteous towards them and exhibited no malice towards her or anyone else that day.

Plaintiff Zalaski testified that Albert did not speak with her directly.   On the video recording immediately prior to the arrest, Zalaski can be heard stating to Officer Hart and Defendant Albert "they have all been running through what do you want" and "arrest me too."  Defendant Albert testified that he mainly conversed with Oatis as Oatis represented that he was the spokeperson of the group.  It is clear from the video recording that while Albert is interacting primarily with Oatis that his request for them to move off the steps was both directed and audible to Zalaski who was standing just several feet away from Oatis holding the opposite end of the six foot wide banner.  Albert testified that he believed there was probable cause to arrest Plaintiffs on the basis of criminal trespass or obstructing free passage.

Between 1997 and 2006, Zalaski protested the Ringling Brothers circus performances in New Haven and Hartford.   In 2007, Zalaski protested the Ringling Brothers circus performances in Hartford and Bridgeport.  She was arrested at the Bridgeport Ringling Brothers protest in the fall of 2007.  Zalaski also protested at the Hartford Red Nose Run event held in 2007.  At the 2007 Red Nose Run, Zalaski testified that she chose to stand on the other side of the walkway by the grassy border and did not try to stand on the steps of the raised patio by the registration tent as she had done in 2006.  In 2008, Zalaski protested at three Hartford Marathon events that had a tie in to the circus, but did not protest the Ringling Brothers circus performance that year.  In 2009, she protested the Ringling Brothers circus at the XL center in Hartford.  After 2009, she stopped attending circus protests.

IV.  **Conclusions of Law**

   *a. General First Amendment Claim*

   The City of Hartford bears the burden of proving the constitutionality of its actions effecting protected First Amendment speech. *See e.g., U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Greater New Orleans Broadcasting Ass'n., Inc. v. United States*, 527 U.S. 173, 183 (1999) ("[T]he Government bears the burden of identifying a substantial interest and justifying the challenged restriction"); *Arizona Free Enterprise Club's Freedom Club PAC v. Bennet*, 131 S. Ct. 2806, 2817 (2011) ("Laws that burden political speech are accordingly subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.") (internal quotation marks and citations omitted); *Deegan v. City of Ithaca*, 444 F.3d 135, 142 ("In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test") (internal quotation marks and citation omitted);  *see also Marcavage v. City of Philadelphia, Pennsylvania*, 271 Fed. Appx. 272, 274 (3d Cir. 2008) (holding that it was the Government's not the Plaintiff's burden to prove that restrictions were not content-based).

   *i. Plaintiffs' speech was on a matter of public concern*

As the Supreme Court held the "First Amendment reflects a profound national commitment to the principal that debate on public issues should be uninhibited, robust and wide-open.  That is because speech concerning public affairs is more than self-expression; it is the essence of self-government.  Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Synder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks and citations omitted).  "[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous."  *Id.* (internal quotation marks and citations omitted).  The Supreme Court has instructed that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Id.* at 1216 (internal quotation marks and citations omitted).

The majority of Plaintiffs' speech at the Red Nose Run, as evidenced by the banners and signs that Plaintiffs carried, Plaintiffs' testimony at trial and the video recording of the event, centered on Plaintiffs' concerns for the ethical and humane treatment of animals at the circus and reflected Plaintiffs' belief that circuses were sad places for animals.  ARF members held banners with the slogans (1) "Got Freedom? The Animals' Don't….," (2) "The Saddest Show on Earth," and (3) "Animal Abuse….Boycott Animal Circuses"   *See* Plaintiffs' Exs. 1, 2b(11) and 2b(8).  ARF members expressed the following statements to passersby

and participants during the event: (1) "children learn nothing about animals through the circus, they learn domination and cruelty," and (2) "Ringling just wants to sell tickets that is the only reason they are here."   *See* Plaintiffs Ex. 1. Clearly, the majority Plaintiffs' speech related to a matter of social or other public concern rather than a matter of "purely private concern" and is therefore protected speech under the First Amendment.

### ii.  Riverfront Plaza is a traditional public forum

The protection afforded speech under the First Amendment is a function of both the type of speech and the place where the speech is uttered.  "It is well established that 'the government need not permit all forms of speech on property that it owns and controls.'"  *Bryne v. Rutledge*, 623 F.3d 46, 53 (2d Cir 2010) (quoting *Int'l Soc'y for Krishna Consciousness, Inc., v. Lee*, 505 U.S. 672, 678 (1992)).  "Under the prevailing constitutional framework, speech restrictions imposed on government-owned property are analyzed under a 'forum-based' approach that divides government property into three categories-the traditional public forum, the designated public forum, and the nonpublic forum."  *Id.*  "As a general matter, the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon." *Hotel Employees & Restaurant Union v. City of New York Dept. of Parks and Recreation*, 311 F.3d 534, 544 (2d Cir. 2002).

The first category of government-owned property is the "traditional" public forum, which is defined as a forum that has "traditionally been available for public expression" and has as "a principal purpose . . . the free exchange of ideas." *Hotel Employees*, 311 F.3d at 544 (internal citations omitted).  Examples of public fora are "streets, sidewalks, and parks, which are properties that have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 544-45 (internal quotation marks and citations omitted).  Content-based restrictions on speech in such fora are subject to "strict scrutiny," meaning that they "must serve a compelling government interest and be narrowly tailored to achieve that interest." *Id.* at 545. "The government may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Id.* (citation omitted).

The second category of government-owned property is the "designated" public forum, which is "a non-public forum that the government has opened for all types of expressive activity." *Id.*  As is the case with traditional public fora, restrictions on speech in designated public fora are constitutional only if they are "content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling state interest and (2) narrowly drawn to achieve that interest." *Id.* (internal quotation marks and citation omitted).

The "limited" public forum[2] is a subset of the designated public forum which exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.*  "In limited public fora, strict scrutiny is accorded only to restrictions on speech that fall within the designated category for which the forum has been opened." *Id.*  "Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Id.* at 545-46.  If expressive activity does not fall within the limited category for which the forum has been opened, "restrictions need only be viewpoint neutral and reasonable." *Id.* at 546.

The third category of government-owned property consists of "property that the government has not opened for expressive activity by members of the public." *Id.* "In a nonpublic forum, the government has "maximum control over communicative behavior." *Bryne*, 623 F.3d at 53.  "The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality." *Hotel Employees*, 311 F.3d at 546.  Examples of non-public fora are airport terminals, military bases and restricted access military

---

[2]     The Second Circuit has noted that the term "limited public forum" has been used in different ways.  *Bryne*, 623 F.3d at 55 n.8.  "Indeed, the law of this Court describes 'limited public forum' as both a 'subset of the designated public forum' and a 'nonpublic forum' opened to 'certain kinds of speakers or to the discussion of certain subjects.'"  *Id.*  However, the Second Circuit concluded that it "need not and [we] do not attempt to further clarify the distinction, if any, between a 'limited public forum' and the three more commonly recognized fora utilized in First Amendment analysis" because there was sufficient Supreme Court authority that the applicable standard of review for the particular fora at issue was viewpoint neutrality and reasonableness.  *Id.*

stores, jailhouse grounds, and the Meadowland Sports Complex. *Id.*  "The government enjoys greater latitude in restricting speech in a nonpublic forum and may limit access or content 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'"  *Byrne*, 623 F.3d at 54 (quoting *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806 (1985)).

The Second Circuit has instructed that "[i]n conducting forum analysis, we examine a variety of factors, including the forum's physical characteristics and the context of the property's use, including its location and purpose."  *Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 342 (2d Cir. 2010) (internal quotation marks and citation omitted).  The "primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.  Also relevant is the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations … Finally, we consider whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity." *Id.* (internal quotation marks and citations omitted).

In *Hotel Employees*, the Second Circuit has expounded on the factors a court conducting a forum analysis should consider: (1) "whether the [property] falls within those categories of property historically deemed to be traditional public fora," (2) "whether it is the *type* of property that should be so classified given its physical characteristics, (3) the objective ways it is used, and (4) the

City's intent in constructing and opening it to the public." 311 F.3d 534, 536-37 (emphasis in the original).

While Riverfront Plaza is owned by the City of Hartford and leased to a private non-profit corporation, these facts are not dispositive as to whether Riverfront Plaza is public or nonpublic forum.  The City leased the park to a private non-profit corporation, whose mission was to further the use and enjoyment of the space by the public.  Consequently, the Lease does not convert the area from a public forum to a non-public forum.  While the Second Circuit has not ruled on this issue on the facts presented here, the Ninth Circuit's decision in *ACLU v. City of Las Vegas*, 333 F.3d 1092 (9th Cir. 2003) arose out of similar facts and is particularly instructive and persuasive.  The Ninth Circuit in recognizing that the First Amendment "must deal with new problems in a changing world" found that an area of street in downtown Las Vegas which had been leased to a private limited liability corporation by the City constituted a traditional public forum as "the street continu[ed] to play its old role as a pedestrian thoroughfare." *Id.* at 1094-95.  The Ninth Circuit noted that there is no "clear-cut test" to determine whether a public forum exists but that "the factors emphasized by the courts consistently reflect two underlying considerations."  *Id.* at 1999-1100. "First, and most significantly, there is a common concern for the compatibility of the uses of the forum with expressive activity." *Id.* at 1100 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.").  "Secondly, the case law demonstrates a

commitment by the courts to guarding speakers' reasonable expectations that their speech will be protected." *Id.* (citing *U.S. v. Grace*, 461 U.S. 171, 180 (1983) (expressing concern regarding allegedly nonpublic forums that provide "no separation ... and no indication whatever to persons ... that they have entered some special type of enclave.")).   However considering the long standing precedent permitting content-neutral time, place manner restrictions, a speaker cannot have a reasonable expectation that their speech will be protected where that speaker obstructs or disrupts the use of a traditional public forum by creating a hazard.

The Ninth Circuit found that the area in question was being used for open public access or as a public thoroughfare and that such uses are inherently compatible with expressive activity.  *Id.*  The Ninth Circuit therefore concluded that the use and purpose of the area as well as its physical characteristics supported the conclusion that the area was a traditional public forum regardless of the fact that the particular area was leased to a private corporation.  *See also Venetian Casino Resort L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 943-44 (9th Cir. 2001) (highlighting cases where private property is deemed to constitute traditional public fora); *Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 75-76 (D. Mass. 1990) (area leased by city to a mall constituted public forum).

The Ninth Circuit's findings turned on its analysis of the traditional factors applied in the circuit to determine whether a forum should be considered a traditional public forum without regard to the fact that the forum in question was

actually leased to a private corporation.   Accordingly, this Court's analysis regarding whether Riverfront Plaza is a public forum will focus on the traditional Second Circuit factors.   These factors are based on an assessment on how the forum is actually used as opposed to the fact of ownership or leased status in this case taking into consideration the Supreme Court's concern to protect speakers' reasonable expectations regarding their speech.  *See Grace*, 461 U.S. at 180 (expressing concern where there is "no separation ... and no indication whatever to persons ... that they have entered some special type of enclave.").  To the extent that the Lease Agreement reflects on how the forum was used or was intended to be used, then the Lease Agreement contains information that is pertinent to the Court's analysis.

The physical characteristics of Riverfront Plaza suggest that the space is being used as and has been conceived of as a traditional park and therefore should be classified as a traditional public forum.  Riverfront Plaza is open to the public, there are benches throughout the Plaza for people to sit and read on, and there is a scenic walkway for people to stroll and run along surrounded by grass and trees.  Further, the objective way the Plaza is used is that of a traditional park.   Joseph Marfuggi testified that the general public uses the Plaza for recreation, to sit and read in, and to mill about.

Further, the terms of the Lease Agreement between Riverfront Recapture and the City of Hartford are indicative of the government's intent in constructing the space and opening it to the public.  The Lease Agreement expressly provides that the "[r]esidents of the City shall retain the same access to Riverfront Park as

such residents had before this Agreement was executed" and that the City of Hartford and Riverfront Recapture "wish to generate active and passive uses of the Riverfront Park for the general public."  *See* Defendant's Ex. D.  Further, the Lease provides that Riverfront Recapture should collect fees and charges for events or activities as a source of revenue for the use and maintenance of Riverfront Plaza.  *See id.* at Section 2.9 (c).  Accordingly, the terms of the Lease illustrate that it is the City's intent that Riverfront Plaza be used as a traditional park for the general public.  This intent is also illustrated by the fact that at the entrance to the Plaza there are large signs announcing that one is entering a "Riverfront Recapture park" and welcoming the public to "Mortensen Riverfront Plaza – the centerpiece of the Riverfront parks."  *See* Plaintiffs' Ex. 2b(1) and Ex. 2b(5).

A space like Riverfront Plaza also falls into the category of property that has historically been deemed to be a traditional public forum.  In fact, parks are routinely given by courts as an example of a quintessential traditional public forum.  The Supreme Court has referred to "streets, sidewalks, and parks" as "properties that 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Hotel Employees*, 311 F.3d at 544-45 (quoting *Perry Educ. Ass'n v. Perry Locan Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 ("[A] park is a traditional public forum for speeches and other transitory expressive acts.").  Here since Riverfront Plaza is used by the general public as a park, it is

therefore compatible with expressive activity.  *See City of Las Vegas,* 333 F.3d. at 1101  ("[W]hen a property is used for open public access or as a public thoroughfare, we need not expressly consider the compatibility of expressive activity because these uses are inherently compatible with such activity.") (citation omitted).   However as will be discussed in more detail below, while Riverfront Plaza is a park which is generally compatible with expressive activity, since the raised patio area during the Red Nose Run was being used as a registration, prize and refreshment area, the Plaintiffs' expressive activity, which impeded the physical and visual access to the area was not compatible with such use at the time of the Red Nose Run.

As a consequence, a speaker who has walked into this space by virtue of the signs demarking the space as a park, the physical characteristics of the space, and how the space has been and is being used would have a reasonable expectation that their speech would be protected.   Considering the characteristics of this particular forum, there would simply be no indication whatever to persons who have entered Riverfront Plaza that they had stumbled onto "some special type of enclave" and were not in a traditional public forum. See *Grace*, 461 U.S. at 171.  Here, Riverfront Plaza like the portion of the Las Vegas Street in *City of Las Vegas* still continues to play its old role as a park for the residents of Hartford to enjoy even though it has been leased to a private non-profit corporation.   Accordingly, the use, purpose, physical characteristics of the space and the City's clear intent in constructing the Plaza to be a public space for

recreation support the conclusion that Riverfront Plaza is a traditional public forum.

The Court is cognizant that the Supreme Court and the Second Circuit have described a designated public forum and a limited public forum as non-public fora which the government has opened up for either all types of expressive activities or for only certain types of expressive activities.  *See Hotel Employees*, 311 F.3d at 545.  For Riverfront Plaza to be properly considered a limited or designated public forum, the Court would have to find that it was not a traditional public forum but rather a non-public forum which was opened up for expressive activity.

The Second Circuit's decision in *Hotel Employees* finding that the Lincoln Center Plaza was not a traditional public forum serves as an instructive counterpoint to the instant case.  In *Hotel Employees*, the Second Circuit found that Lincoln Center Plaza was not a traditional public forum on the basis that it had not been dedicated as a city park and that its location and purpose was not similar to the types of properties that have historically been defined as traditional public fora.  *Id.* at 550.  The Court reasoned that Lincoln Center Plaza's location and purpose was to serve as the centerpiece for and extension of the Lincoln Center performing arts complex and was therefore distinguishable from the "typical recreational park or town square."  *Id.*  The Second Circuit concluded that "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses, or in which the government's ability to restrict speech has historically been

circumscribed." *Id.* at 551.  Ultimately, the Second Circuit held that Lincoln Center Plaza "has not historically been open to all types of expression, and while it may share some of the same physical characteristics as sidewalks or parks, its primary function and purpose, together with its historical use, distinguish the Plaza from those types of properties that have heretofore been deemed traditional public fora." *Id.* at 551 n12.  In the instant case, Riverfront Plaza, unlike Lincoln Center Plaza, does not serve as a forecourt to a performing arts complex.  Instead the primary purpose of Riverfront Plaza as evidenced by the terms of the Lease, its present and historical use and physical characteristics is that of a public park for general recreation.  Such a property is exactly the type of property that has historically been deemed a traditional public forum.   The Court therefore sees no basis to conclude that Riverfront Plaza is a nonpublic forum which has been opened for expressive activity.

The Parties' prior pleadings and the testimony submitted at trial focused on the fact that the Hartford Marathon Foundation had obtained a permit to stage the Red Nose Run and specifically had obtained permission to use the raised patio area for their registration tent, suggesting that the issuance of that permit converted Riverfront Plaza into a non-public forum.  The City expressly reserved the right in the Lease Agreement with Riverfront Recapture to issue permits to private groups to use the park.  *See* Defendant's Ex. D at Section 2.9(c).  *Id.* Although our circuit has not had occasion to rule on this issue, other circuits have held that the "issuance of a permit to use [a] public forum does not transform its status as a public forum."  *See e.g., Startzell v. City of Philadelphia,*

*Pennsylvania*, 533 F.3d 193 (3d Cir. 2008); *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005); *Pledge of Resistance v. We the People 200, Inc.*, 665 F.Supp. 414, 417 (E.D.Pa. 1987) ("the existence of a permit to use a public forum cannot justify excluding protected expression unless the protected activity will cause actual disruption of the events covered by the permit").

In *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), the city issued a permit to the Columbus Arts Council to stage an arts festival open to the general public that was held along the riverfront in downtown Columbus, Ohio.  The Sixth Circuit overturned the district court's conclusion that the permit had the effect of transforming the streets along the riverfront into a limited public forum for a limited period of time.  *Id.* at 649-50.  In coming to this conclusion, the Sixth Circuit noted that the "City cannot transform a traditional public forum simply because it so desires."  *Id.* at 650 n.5.  The Sixth Circuit found that "[t]he city cannot claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remained free and open to the public."  *Id.* at 652.  In that case, the plaintiff "attempted to exercise his First Amendment free speech rights at an arts festival open to all that was held on the streets of downtown Columbus.  Under these circumstances, the streets remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council."  *Id.*

In *Startzell*, a private non-profit organization had organized and obtained a permit to conduct a gay pride event which took place on the streets and sidewalks in Philadelphia.  533 F.3d 193 (3d Cir. 2008).  The Third Circuit reasoned

that since the event took place in an "undisputed quintessential public forum" that the issuance of the permit could not "transform its status as a public forum." *Id.* at 196.  The *Startzell* court emphasized that the principle that streets and parks "'have immemorially been held in trust for the use of the public'… has been reiterated in case after case" and found that the grant of a permit did not "alter[] that still viable principle."  *Id.* at 195-196 (internal quotation marks and citation omitted).  In coming to this conclusion, the Third Circuit referenced the "long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora." *Id.* (citations omitted).

The *Startzell* Court also pointed to the Supreme Court's decision in *Grace*, 461 U.S. at 45 for the proposition that the government "may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums."  461 U.S. at 179. (internal quotation marks and citation omitted).  In *Grace*, the Supreme Court held that a statute prohibiting the display in the Supreme Court building or on its grounds any flag, banner or device designed or adapted to bring into public notice any party, organization or movement was unconstitutional.   Since the statute at issue extended to the public sidewalks surrounding the Supreme Court building, the Supreme Court found that the "inclusion of the public sidewalks [in the statute]… result[ed] in the destruction of public forum status that [wa]s at least presumptively impermissible." *Id.* at 180.  The Supreme Court emphasized that "[t]raditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason it

abuts government property that has been dedicated to a use other than as a forum for public expression.  Nor may the government transform the character of the property by the expedient of including within a statutory definition of which might be considered a non-public forum parcel of property."  *Id.*  Further, the Supreme Court has emphasized that the "streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Hudgens v. NLRB,* 424 U.S. 507, 515 (1976) (internal quotation marks and citation omitted).

The Court agrees with these cases holding that the issuance of a permit to use a public forum does not necessarily transform its status as a public forum. Although the Red Nose Run organizers had obtained a permit to use Riverfront Plaza for the event, the event was open to the public and situated in a space that has "immemorially been held in trust for the use of the public" as was the case in both *Startzell* and *Parks*.  The City has not cited and the Court has not found any legal authority that a permit allowing a private party to stage a public event has the effect of destroying the historical public forum status traditionally bestowed on parks and streets.   Much like the sidewalks in *Grace* which did not lose their public forum status because they abutted government property not dedicated for public expression or were included within a statutory definition, Riverfront Plaza did not lose its public forum status because there was a permit for the Red Nose Run.  If a city could on any given day destroy the traditional public forum status of a park on the basis of a permit that would have the effect of undermining and

not guarding speakers' reasonable expectations that their speech would be protected.  As the Sixth Circuit in *Startzell* noted the principle that streets and parks have immemorially been held in trust for the use of the public discourse is well established.  533 F.3d at 195.  To hold that a permit could destroy a park's quintessential public forum status would fatally undermine this long standing and cornerstone principle of First Amendment law.   Accordingly, the Court finds that Riverfront Plaza is a traditional public forum.   Having determined that Riverfront Plaza was a public forum, the Court now turns to the question of whether the speech restriction imposed by the City passes constitutional muster.

### iii.  Defendant's actions were a content-neutral time place manner restriction

It is well established that in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech; "the United States Supreme Court has articulated a three-part test to determine whether such restrictions interfere with rights guaranteed by the First Amendment."  *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  "To withstand constitutional scrutiny, government restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression."  *Deegan*, 444 F.3d at  142 (citing *Ward*, 491 U.S. at 791)).

The "'principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with

the message it conveys.'" *Int'l Action Center v. City of New York*, 587 F.3d 521, 526 (2d Cir. 2009) (quoting *Ward*, 491 U.S. at 781).  A regulation "justified without reference to the content of the regulated speech" is content neutral. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) (internal quotation marks and citation omitted).

A content-neutral time, place, or manner restriction generally "need not be the least restrictive or least intrusive means" of serving the government's legitimate interests.  *Ward*, 491 U.S. at 798.  Narrow tailoring "is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.  To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests."  *Id.* at 799 (internal citations and quotations omitted).   The Second Circuit has instructed that "a content-neutral regulation furthering a legitimate government interest and imposing only an incidental burden on speech will be narrowly tailored 'if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"  *Five Borough Bicycle Club v. City of New York*, 308 Fed. Appx. 511, 513 (2d Cir. 2009) (quoting *Vincenty v. Bloomberg*, 476 F.2d 74, 84 (2d Cir. 2007)).  "In other words, [t]he essence of narrow tailoring is having the regulation focus[ ] on the source of the evils the city seeks to eliminate ... and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils."  *Id.* (internal quotation marks and citation omitted).

At the outset, the Court is mindful that the instant case involves a challenge to a police officer's oral directive which had the effect of restricting speech as opposed to a challenge to a municipal ordinance or statute restricting speech.  The majority of First Amendment cases are based on the posture of such latter cases.  At trial, Plaintiffs' counsel argued that a time, place, manner analysis was not applicable to police action.  However, this Court is not aware of any precedent in the Second Circuit or any other circuit which limits the time, place manner analysis to municipal ordinances or statutes as Plaintiffs' counsel suggested.  Further, Plaintiffs have not cited any authority.

On the contrary, there is significant caselaw in the Third, Sixth and Seventh Circuits analyzing a police officer's directive under the rubric of a content-neutral time, place, manner restriction.  *See e.g., McTernan v. City of York, Pennsylvania*, 564 F.3d 636 (3d Cir. 2009) (considering whether a police officer's directive to move out of an alley outside an abortion clinic was a permissible content-neutral time, place, manner restriction); *Startzell,* 533 F.3d 193 (3d Cir. 2008) (applying a content-neutral analysis in finding police officers did not violate the First Amendment when the officers prevented counter-protestors from disrupting or interfering with the message of the permit-holder staging a gay pride event); *Pouillon v. City of Owosso*, 206 F.3d 711 (6th Cir. 2000) (finding that fact issues precluded summary judgment on whether police officer's directive requiring plaintiff to move to the sidewalk from the steps of city hall was a reasonable, place and manner restriction that left open ample alternative channels of communication); *Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011)

(finding that police officers' directive not permitting members of a religious organization to stand on the sidewalks that lead to a homosexual athletic and cultural event was a content-neutral restriction which was sufficiently narrowly tailored to a significant government interest and accommodated the need to provide ample alternative channels for expression).

The Third Circuit's decision in *McTernan v. City of York, Pennsylvania*, 564 F.3d 636 (3d Cir. 2009) is instructive as to the appropriate level of scrutiny and analysis to apply in the context of challenges under the First Amendment to an oral police directive.  In *McTernan*, an anti-abortion protestor challenged the constitutionality of a restriction imposed by a police officer on the protestor's ability to walk in an alley which was adjacent to a reproductive health clinic to speak to clients of the clinic.  The plaintiff, McTernan, contended that the police officer's directive to not stand in the alley violated both his First Amendment right to the free exercise of his religion as well as his free speech rights.  The Third Circuit found that the police officer's restriction was content-neutral as there was no evidence of police hostility toward McTernan's pro-life views nor was there "a scintilla of evidence suggesting that the [police officer] was motivated by disagreement with McTernan's pro-life views." *Id.* at 653.

The Third Circuit next considered whether the government's interest in promoting the safe, efficient flow of traffic in the alley was a significant interest. The Third Circuit noted that DVDs supplied by the Plaintiffs "depict[ed] a peaceful setting, with very few people outside the clinic [and] it is undisputed that the alley is lightly traveled."  *Id.* at 651.  The Court considered these facts in their analysis

38

of McTernan's free exercise claim and concluded that these facts did not establish a compelling safety hazard as a matter of law. *Id.* The Court reasoned that it "accept[ed] as a general proposition, that police have an interest in safety and avoiding collisions between cars and pedestrians in the alley. It surely is an important interest, in the abstract, but query whether the interest was 'compelling' in this fact pattern." *Id.* at 650-651. However, the Third Circuit concluded that the government's interest in traffic safety "while not 'compelling' for purposes of McTernan's free exercise claim was "real and could be termed, 'significant'" for purposes of McTernan's free speech claim on the basis of the physical dimensions of the alley as well as the presence of pedestrians and heavy trucks in the alley which presented a safety hazard. *Id.* at 654. The Third Circuit also noted that such an interest has been recognized by the Supreme Court as significant in past cases. *See e.g., Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994);*Shenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997). In *Madsen*, the Supreme Court upheld a fixed buffer zone around clinic entrances based on the government's "strong interest in ensuring the public safety and order, [and] in promoting the free flow of traffic on public streets and sidewalks...." and found that the protesters' presence in a street used to access the clinic created a traffic hazard. 512 U.S. at 767, 769. In *Shenck*, the Supreme Court upheld another fixed buffer zone based on the significant government interest in traffic safety and finding that the presence of protestors in an abortion clinic driveway created a "dangerous situation." 519 U.S. at 375-76.

Lastly, the Third Circuit considered whether a more searching review of the restriction than is typically applied under intermediate scrutiny was warranted in light of the circumstances of the case. *Id.* at 654-56. The Third Circuit concluded that a more searching review is appropriate in cases where a police directive is issued by officers in the field. In coming to this conclusion, the *McTernan* Court reasoned that a police directive was similar to an injunction and observed that the Supreme Court in *Madsen* had "mandated a 'more searching' review where a restriction takes the form of an injunction, rather than a legislative enactment." *Id.* at 654. The Third Circuit emphasized that the Supreme Court in *Madsen* identified two risks warranting a "more stringent application of general First Amendment principles." *Madsen*, 512 U.S. at 765. "First, injunctions do not emanate from deliberative, democratic decision making processes … [and] Second, injunctions, which target discrete groups rather than society generally, may not attract public scrutiny, increasing the likelihood that unreasonable injunctions will escape public condemnation." *McTernan*, 564 F.3d at 654-55 (citing *Madsen*, 512 U.S. at 764-765).

The Third Circuit concluded that:

> a police directive, issued by officers in the field, poses risks similar to those presented by an injunction, warranting heightened scrutiny. First, a police directive, like an injunction, does not embody the popular will but, rather, represents an exercise of executive authority. The absence of democratic involvement was particularly stark here. Sergeant Barth, apparently, conceived the restriction without meaningful public input and without reference to formal policy or administrative channels. Further, Sergeant Barth's directive did not result from deliberative, democratic processes-that is, it was not the product of a legislative choice regarding the promotion of particular societal interests. Democratic input is

especially critical in formulating speech restrictions, which must carefully balance constitutional rights against public safety imperatives.   Further, as in *Madsen*, the directives here, which focused on First Amendment activity at a single reproductive health clinic, might easily escape public scrutiny, requiring more vigilant judicial oversight.  Hence, a directive issued by officers in the field, such as the one issued by Sergeant Barth, presents constitutional hazards similar to those identified with injunctions in *Madsen*. Police directives, in fact, present potentially greater opportunities for arbitrary enforcement than injunctions. Whereas injunctions are written, police directives are oral. Oral directives often lack the precision and specificity required of federal injunctions.  Moreover, oral police directives are less amenable to judicial, executive, and public oversight.

*Id.* at 655 (internal quotation marks and citation omitted).

The Third Circuit suggested that the application of a more searching review would then modify a "single, but significant, aspect of the *Ward* analysis – the 'tailoring' requirement."  *Id.*  Under traditional intermediate scrutiny, "a restriction is narrowly tailored to achieve an important governmental interest if that interest would be less effectively achieved without the regulation.   However, a regulation need not represent the least restrictive means of achieving the articulated aim.  If a restriction represents the most effective means of accomplishing the stated purpose, it will survive intermediate scrutiny, even if other alternatives would place a lesser burden on individual speech."  *Id.* (citing *Ward*, 491 U.S. at 799). The Third Circuit reasoned that a more searching scrutiny "by contrast, imposes a more stringent 'narrowing' requirement.  Proof that a restriction represents the most effective means of achieving the proffered government interest is insufficient.   Instead, a restriction will survive heightened scrutiny only if it 'burden[s] no more speech than necessary' to serve that interest."  *Id.* (quoting Madsen, 512 U.S. at 765).  The *McTernan* court found that significant fact issues

precluded summary judgment on the tailoring requirement and noted that a "restriction cannot be 'narrowly tailored' in the abstract; it must be tailored to the particular government interest asserted.  Only when the contours of that interest are clear may we decide whether the means selected to accomplish it have been 'narrowly tailored.'"  *Id.* at 656.

The Court finds the Third Circuit's rationale in applying a more searching scrutiny to restrictions issued ad hoc by police officers on the scene to be persuasive.  The Court is cognizant that the potential for constitutional abuses is heightened where a police officer arrives on the scene and makes a split second judgment on the appropriate balance between the government's interest and the speaker's First Amendment right.  A more searching scrutiny also better accommodates the Supreme Court's concern that a "State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions."  *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940) (The Supreme Court also held that while the state may not unduly suppress communication, the "state has power to prevent or punish when clear and present danger of riot, disorder, interference with traffic upon public streets, or other immediate threat to public safety, peace or order, appears"); *see also Feiner v. New York*, 340 U.S. 315, 321 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker, and are also mindful of the possible danger of giving overzealous police officials complete discretion to break up otherwise lawful public meetings.").

In addition to the Third Circuit's analysis in *McTernan*, the Court finds the facts and holding of the Seventh Circuit's recent decision in *Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011) pertinent and informative.   In *City of Chicago*, the members of a religious organization alleged that police officers impermissibly restricted their efforts to conduct outreach activities during the Gay Games, a homosexual athletic and cultural event held at Soldier and Wrigley Fields in Chicago. 659 F.3d at 629.  At Soldier Field, Plaintiffs who were holding signs and banners demonstrated around the stadium on a broad sidewalk bordering one street.   At one point, the defendant police officer advised the plaintiffs that they were blocking the sidewalk and directed them to a gravel area adjacent to the sidewalk.   At Wrigley Field, an officer instructed one plaintiff who was standing at the intersection of two main thoroughfares for attendees entering the stadium to "keep moving."   *Id.* at 630.  When the plaintiffs failed to comply with the officers' directives at both Wrigley and Soldier fields they were arrested and charged with disorderly conduct.   Plaintiffs argued that the officers' prohibitions against standing on the sidewalk prevented them from engaging attendees in a "one-on-one presentation of the Gospel of Jesus" and "that they experienced difficulty handing out Gospel tracts from their position on the gravel."  659 F.3d at 629.

The Seventh Circuit found that the orders given by the Officers at both Wrigley and Soldier fields met the requirements under *Ward* that the restriction be content-neutral, narrowly-tailored to serve a significant government interest and left open ample alternative channels for communication.   *Id.* at 630-31.  The

Seventh Circuit noted that "[a]t both locations, officers instructed the plaintiffs to 'keep moving' to avoid interference with pedestrian traffic at the Games.  When they refused, they were asked to move to alternate locations. (At Soldier Field, the officer suggested they move to a gravel area immediately adjacent to the sidewalk.   At Wrigley Field, they were asked to cross the street.)" *Id.* at 631.

The Seventh Circuit concluded that Plaintiffs had failed to produce any evidence that the officers were hostile to their message and therefore the restrictions were deemed content-neutral.  The Seventh Circuit noted that the Plaintiffs did not dispute that the government maintains a significant interest in controlling pedestrian traffic and therefore "the only remaining challenge is to the adequacy of the alternative venues presented for their speech. The plaintiffs argue the restrictions were overly broad; we disagree." *Id.*  Plaintiffs argued that they were not blocking the sidewalks, however the Seventh Circuit found that plaintiffs' "own video recordings taken at the events plainly show pedestrians walking around them while they remain stationary." *Id.* at 631 n. 2.   Plaintiffs also argued that the gravel area at Soldier Field and the southern side of the street opposite Wrigley field were not adequate places to conduct their activities.  The Seventh Circuit rejected Plaintiffs' argument noting that the "fact that the permissible locations were not the plaintiffs' preferred venues does not render them inadequate.  After all, the First Amendment 'does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.'"   *Id.* at 631 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)).

The Seventh Circuit concluded that the First Amendment "protects to right of every citizen to 'reach the minds of willing listeners …[and] to do so, there must be opportunity to win their attention.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 728 (2000)).   The Court of Appeals concluded that the "alternate locations were within view and earshot of those traveling to the Games.  We harbor no doubt that from these locations, the plaintiffs had ample opportunity to capture the attention of the Games attendees and supporters; they were only limited by their own stubborn refusal to move there.   As to the plaintiffs' challenge that the restrictions were overly broad, though a regulation need not be the least restrictive means available, we cannot think of a narrower way of dealing with demonstrators blocking a pedestrian walkway than to request that they continue moving or change their location to a place very nearby." *Id.*  While the Seventh Circuit did not adopt the Third Circuit's approach applying a more searching scrutiny to the narrowly tailored prong of the *Ward* analysis, the Court of Appeals stated that the restrictions at issue would satisfy such heightened scrutiny.

Here as was the case in both *McTernan* and *Marcavage*, there is no evidence of police hostility towards the Plaintiffs' animal rights views.  Defendant Albert's demeanor, tone of voice and manner on the video was calm and respectful.  Plaintiff Zalaski testified that Albert was courteous and did not exhibit "malice" to herself or anyone else.  In addition, there is also no evidence that the event organizers who called the Hartford Police were animated by disagreement with Plaintiffs' message.  The testimony at trial from Shluger and Greaser as well as the statements they expressed on Plaintiffs' video recording demonstrate that

although they became aware of the Plaintiffs because some attendees complained about the content of Plaintiffs' speech, Shluger and Greaser were not motivated by the content of Plaintiffs' speech, but rather by their concern that Oatis and Zalaski's position on the steps would interfere with the ability of participants to safely reach and congregate around the registration, prize and refreshment tent.  Albert made no statement concerning and showed no reaction to the content of Plaintiffs' speech.  Moreover, had he been motivated by the content of their speech or the attendees' objection to the content of their speech, he would have likely arrested the Plaintiffs when the complaint was first made. He also would have arrested all of the animal rights protestors at the event. Further evidence that Albert's conduct was content neutral is the fact that he did not order the Plaintiffs to disperse and leave the event entirely but simply requested that they relocate several feet away from the registration tent area to the grassy border adjacent to the racecourse to continue their protest.  Albert did not arrest any of the other protestors who had moved and were standing on the grassy border across the walkway from the raised patio.   These facts demonstrate soundly that Albert was not motivated by disagreement with Plaintiffs' message and accordingly his directive should be considered a content-neutral restriction.

The Defendants' evidence suggests that there were two significant interests underlying Officer Albert's directive.  First, there was the interest in controlling pedestrian traffic and public safety.  The Court finds the Third Circuit's analysis in *McTernan* to be helpful in examining whether this interest

was significant.   In *McTernan*, the Third Circuit suggested that when a court scrutinizes a proffered interest to determine if it is compelling that it should consider whether the proffered interest was compelling in light of the specific conditions prevailing at the time in the particular space.   In *McTernan*, since the video recording displayed a peaceful scene where there was little vehicular traffic in the alley, the Third Circuit found that the facts and circumstances could not establish a compelling interest as a matter of law.   However with respect to finding of a significant interest, the Third Circuit's analysis did not scrutinize the specific conditions at that time but rather acknowledged that a significant interest could be predicated on the general and prospective conditions of the space.  The Third Circuit reasoned that the physical dimensions of the alley, the presence of people in a public thoroughfare along with vehicles presented a safety hazard that was real.  The Third Circuit also considered past Supreme Court precedent recognizing such interest as significant in coming to the conclusion that the interest invoked by the government could be termed significant.

Here, Plaintiffs have suggested that the free flow of pedestrian traffic and public safety could not have been a significant interest because of the fact that the participants at the Red Nose Run were walking around and behind Oatis, Zalaski and their six-foot wide by four-foot tall banner which were situated on the steps of the raised patio without trouble.   However the general and prospective conditions of Riverfront Plaza and the Red Nose Run suggest that these interests were significant.  Considering that Oatis and Zalaksi were holding a large banner stationary on the second step of the raised patio immediately adjacent to the

registration tent where several hundred children and their parents would be lining up to receive the food and prizes that were being distributed as the races ended did present a safety hazard and a blockage to the flow of pedestrian access to the registration tent that was real and should likewise be termed significant. Moreover the risk of such a hazard and blockage was increased by the fact that the event organizers anticipated that at the end of the last run, the majority of the participants and their parents would descend and congregate on the raised patio area to receive the food and prizes being distributed.

In addition it is clear from Albert, Greaser, and Shluger's testimony at trial and Plaintiffs' video recording that Albert was in fact concerned with and motivated by public safety and the concern for the free flow of pedestrian traffic in Riverfront Plaza.  On the video recording, Shluger explains to Albert, Oatis and Zalaski that the protestors cannot be on the pavement since the children will be running through the walkway on the pavement.  In fact, Oatis recognizes that their primary concern is with safety when he comments that they will not get in the way and states that "the last thing we are going to do is have some kids trip on each other" or "have something bad happen."  Albert also remarks to Oatis that the "children are running a race here" expressly indicating his concern with public safety and the free flow of pedestrian access.

The Supreme Court has also long recognized that the government's interests in the orderly movement, flow of pedestrian traffic, and public safety as substantial government interests justifying content-neutral restrictions on expressive activities.  *See e.g., Heffron*, 452 U.S. at 650 ("As a general matter, it is

clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); *Madsen*, 512 U.S. at 768 (recognizing the state "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks."). Accordingly, Defendant's proffered interests in controlling pedestrian traffic and public safety should be considered significant government interests.

Second, the Defendant suggests that the government has a significant interest in ensuring that the permit-holder can use the permit for the purpose it was obtained.   In this present case, the government suggests that it has the significant interest in ensuring that the event organizers had the ability to use the raised-patio area for the registration and distribution of food and prizes for the Red Nose Run.   The Third Circuit in *Startzell* discussed the interest of permit-holders and noted that the "'principle of content neutrality does not mean … that a permit system exists only as an office operation without enforcement capability.'"   533 F.3d at 198 (quoting *Kroll v. U.S. Capitol Police*, 847 F.2d 899, 900 (D.C.Cir. 1988)).   The *Startzell* court concluded that the "right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit.   The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained.  This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder ... The principle of content neutrality does not divest police officers of the ability to

enforce valid permits and to ensure that permitted speech is allowed to take place." *Id.* at 198-199.  Although the *Startzell* court's analysis focused on the interest in allowing the permitted speech to take place, the Court sees no reason why this reasoning is not equally applicable to an interest in allowing the permitted activity to take place.

In the present case, Plaintiffs were posing an impediment to the ability of the event organizers to fully use the patio-area for the permitted activity of registering the participants in the run and distributing food and prizes at the end of the run.   Further, the importance of this interest is evidenced in the Lease Agreement which specifically authorizes Riverfront Recapture to allow the Plaza to be used by private groups as a source of revenue and specified that such activity be limited to a designated area.  *See* Defendant's Ex. D at Section 2.9(c).  Considering that the Lease Agreement expressly authorizes such uses for Riverfront Plaza and the City's interest in securing revenue to fund the maintenance and operation of the Plaza for the public's use and enjoyment through permitting such events, the Court finds that the government has a significant interest in ensuring that the permit-holder can use the permit for the purpose it was obtained.

Lastly, the Court finds that Defendant's directive that Plaintiffs relocate several feet across the walkway on the grassy border was narrowly tailored to serve the significant interests of controlling pedestrian traffic, public safety, and ensuring the permit-holder can use the permit for the purpose it was obtained. The directive to move across the walkway was the most effective means of

achieving the proffered interests as it burdened no more speech than necessary to serve those interests.  As the Seventh Circuit concluded in *City of Chicago* "we cannot think of a narrower way of dealing with demonstrators blocking a pedestrian walkway than to request that they continue moving or change their location to a place very nearby."  659 F.3d at 631.   By requesting the plaintiffs to move off the steps of the raised patio that had the effect of eliminating the risks presented to public safety posed by the Plaintiffs' holding a large banner in a stationary position in the midst of the registration area.  It also eliminated the blockage of pedestrian access into the registration tent posed by plaintiffs and their large banner and allowed the event organizers to use the raised patio area for the purpose it was reserved.

This restriction was also the least restrictive burden on Plaintiffs' speech as Plaintiffs could still be as easily seen and heard by the participants and passersby in the Plaza across the walkway.   The children would be running right past the location where Officer Albert directed Plaintiffs to move and in fact the children would actually be running closer to Plaintiffs in that location as opposed to Plaintiffs' preferred location on the steps.   While Plaintiffs argue that the location on the steps was "ideal" as their banner was in the direct sightline of the runners, it is well recognized that the "First Amendment does not guarantee a speaker an absolute right to actual conversation with his audience in every circumstance."  *McTernan,* 564 F.3d at 656-57.   Nor does the First Amendment entitle a speaker to their choice locale. *Heffron*, 452 U.S. 640, 647 (1981).

Considering the layout of the Plaza, the route of the children's races and the fact that the participants and their parents would be lining up at the registration tent at the end of the races, the Court cannot think of a narrower way of dealing with the risks that Zalaski and Oatis posed by standing stationary with a large banner on the steps of the raised patio.   There is not another location in Riverfront Plaza that would represent a lesser restriction on their speech to which Albert could have directed Plaintiffs toward.   Moreover, Plaintiffs have not suggested that a less restrictive location exists.  Plaintiffs have only argued that the First Amendment entitled them to stay on the steps where they were.  As discussed above, considering the government's significant interests and the real risks that Plaintiffs posed in the location they were standing, the First Amendment did not entitle them to stay moored onto the steps.

Accordingly, the Court finds that Officer Albert's directive also left open ample alternative channels for communication of information.   Albert did not order the Plaintiffs to disperse from the event entirely but simply to move several feet away from the patio to continue their protesting activities.   In the location to which Albert directed Plaintiffs to move, Plaintiffs signs and banners would still be visible and their speech audible to participants and passersby in the Plaza. Since Plaintiffs would actually be closer to the participants as they ran in the races their words would still be heard.   In addition, Plaintiffs were still afforded with the opportunity to engage in face-to-face communications with passersby to express their message in the location Albert proposed.   For the foregoing

reasons, the Defendant's restriction on Plaintiffs' speech was a permissible content-neutral time place manner restriction under the First Amendment.

The Supreme Court has further instructed that the "nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable." *Grayned v. City of Rockford*, 408 U.S. at 116.   In addition, the Supreme Court has directed courts to consider whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.   *Id.* The Supreme Court in *Grayned* illustrated this concept with three examples.   First, it noted that since "two parades cannot march on the same street simultaneously [the] government may allow only one." *Id.* at 115-116 (citation omitted).   Second, a "demonstration or parade on a large street during rush hour might put an intolerable burden on the essential flow of traffic and for that reason could be prohibited." *Id.* (citation omitted).   Lastly, "[i]f overamplified loudspeakers assault the citizenry, government may turn them down." *Id.* (citation omitted).

Here, the pattern of Riverfront Plaza's normal activities includes the staging of permitted events open to the public like the Red Nose Run.   The normal activity of Riverfront Plaza on the day of the Red Nose Run at the raised patio area was that of a registration and prize collection area.   Plaintiffs' demonstration activities in which they stood stationary with a large banner within the registration and prize collection area was clearly incompatible with the normal activity of Riverfront Plaza on that particular day at that particular time.   The Supreme Court's example in *Grayned* that two parades cannot march on the

same street simultaneously is particularly relevant.   Here to allow Oatis and Zalaski to hold their banner in the midst of the registration and prize area visually and physically obstructing race participants would be similar to allowing two parades to march on the same street simultaneously.   Accordingly, as the Supreme Court suggested a restriction permitting only one of these activities to take place in the space of the raised patio area at that time would be a permissible time, place manner restriction.   Therefore, the Court finds Albert did not violate Plaintiffs' First Amendment rights.

### iv.   Qualified Immunity – First Amendment

Assuming arguendo that Defendant Albert's directive was not a permissible content-neutral time, place, manner restriction, Albert would be entitled to qualified immunity.   The Supreme Court has established a two-part inquiry to determine when a district court should hold that the doctrine of qualified immunity bars a suit against government officials: (1) the court must first consider whether the facts alleged, when taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right, *Saucier v. Katz*, 533 U.S. 194, 2151 (2001); and (2) the court must then consider whether the officials' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Subsequently, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court ruled that courts are permitted to exercise their discretion in determining which of the two prongs should be addressed first.

The First Amendment declares in part that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I.  Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment.  *See Edwards v. South Carolina*, 372 U.S. 229 (1963); *Thornhill v. Alabama*, 310 U.S. 88 (1940).  In addition, speech concerning matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Synder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks and citations omitted).

Whether Defendant Albert was entitled to qualified immunity in the instant case requires the Court to consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  It is clearly established that the government may "impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Hotel Employees*, 311 F.3d at 545 (internal citations omitted). Accordingly, it would not be clear to a reasonable officer that his actions of imposing a content-neutral limited restriction requiring that a group protestors posing a safety risk and impeding the flow of pedestrian access in a public forum relocate to an area nearby was unlawful.

In addition, the Supreme Court has long held that while a state should not unduly suppress expression, the state has the power to prevent or punish when

there is a present danger of disorder or interference of traffic or other immediate threat to public safety, peace or order.   *See Cantwell*, 310 U.S. at 308.   Here, Defendant Albert had a reasonable belief that Plaintiffs were posing an immediate risk to the public safety by standing stationary holding a large banner in the location where hundreds of people would shortly be congregating after the end of the children's races.    Accordingly, a reasonable officer when presented with such circumstances would believe that he had the lawful authority to prevent such a risk.

Considering the long standing principle that the state can impose content-neutral time, place, manner restrictions, a reasonable police officer would believe his action was lawful where he had made a good faith attempt to accommodate a protestor's right to speak while reducing the risks posed by the speaker's presence in the public forum as Albert did.   The reasonableness of this belief is underscored by the Seventh Circuit's recent decision in *City of Chicago* finding that a police officer's directive to a protestor to move to a nearby area was a permissible time, place, manner restriction.   659 F.3d at 626.

The Court is also mindful that considering the complex and nuanced contours of First Amendment law it would be unreasonable to expect that a reasonable police officer's understanding of the First Amendment would reflect those complexities and subtleties.    Therefore a reasonable officer would understand broadly that while the First Amendment did protect the Plaintiffs speech at Riverfront Plaza, the First Amendment did not "guarantee the right to communicate one's views at all times and places or in any manner that may be

desired" and that the state had the power to require a speaker to relocate to another area nearby to serve a significant public interest. *Heffron*, 452 U.S. at 647. Accordingly, it would not be clear to a reasonable police officer that his conduct would be unlawful in the situation that Albert had confronted. Albert is therefore entitled to the protection of qualified immunity.

### b. Connecticut Constitution Claim – Article First, §§ 4 and 14

Plaintiffs allege a violation of their right to free speech afforded to them by Article First, §§ 4 and 14 of Connecticut Constitution which provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Further, Article First, § 14, provides that "[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

In *State v. Linares*, 232 Conn. 345 (1995), the Connecticut Supreme Court articulated the standard applicable to claims under Article First, §§ 4, 5 and 14 of the Connecticut Constitution. The Connecticut Supreme Court concluded that Article First, §§ 4, 5 and 14 afforded individuals greater protection for expressive activity than that provided by the First Amendment to the United States Constitution based on its analysis of the text of the constitutional provisions, the holdings of the Connecticut Supreme and Appellate Courts, the examination of other states' decision, the historical context of the constitutional setting, and economic, sociological and public policy considerations. *Id.* at 378-81.

In its analysis, the Connecticut Supreme Court noted that it "often look[s] to United States Supreme Court precedent when construing related provision in our state constitution."  *Id.* at 379 (internal quotation marks and citation omitted). After reviewing United States Supreme Court precedent, the Connecticut Supreme Court "declin[ed] to follow the modern, forum based approach currently employed to resolve claims under the first amendment to the United States constitution that concern abridgement of speech on public property," and instead "adopt[ed] the 'compatibility' test, as expressed in *Grayned v. Rockford* … for claims brought under the Connecticut Constitution that involve restrictions on speech on public property." *Id.* (citing *Grayned*, 408 U.S. at 116-117).   The Connecticut Supreme Court reasoned that "G*rayned*'s fact specific, flexible approach will offer more protection to freedom of speech as envisioned in our state constitution," since the "*Grayned* approach is designed to maximize the speech which the government is constitutionally required to tolerate consistent with the appropriate and needful use of its property.  *Id.* at 381, 384 (internal quotation marks and citation omitted).

The Connecticut Supreme Court has interpreted *Grayned* to "require[] the government, under the Connecticut Constitution, to permit free speech and public expression on government property up to the point when such free expression becomes basically incompatible with the normal activity of a particular place at a particular time … [I]n assessing the reasonableness of a regulation, we must weigh heavily the fact that the communication is involved,

the regulation must be narrowly tailored to further the State's legitimate interest." *Id.* at 387 (internal quotation marks and citation omitted).

The Connecticut Supreme Court has remarked that the "central issue" under the *Grayned* approach is "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time … This emphasis on basic compatibility, rather than on categorization of particular types of public property, reflected the court's attempt to serve the first amendment value of maximizing social communication." *Id.* at 378. In addition, the Connecticut Supreme Court lauded that the *Grayned* "model of first amendment analysis required a case-by-case balance of the right to free speech against the competing interest of preventing unreasonable interference with the 'normal activity' of a particular place. Free from the modern inquiry containing varying levels of judicial scrutiny, the *Grayned* model focused not on the labeling of property as 'traditional public' or 'non-public,' but on whether the specific use of government property compelled some level of speech regulation." *Id.* at 382-83 (citation omitted).

Further, the United States Supreme Court in *Grayned* held that while the government "has no power to restrict such [expressive] activity because of its messages. Our cases make equally clear, however, that reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted." *Grayned*, 408 U.S. at 116. The Supreme Court instructed that the "nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable'" *Id.*

(citation omitted).   The Supreme Court emphasized that any time, place, and manner regulation must be "narrowly tailored to further the State's legitimate interest." *Id.*

The Supreme Court's articulation in *Grayned* of the reasonable time, place and manner restriction analysis is substantially similar to the current Supreme Court analysis.  The current approach appears to have been first articulated by the Supreme Court in *U.S. v. Grace*, 461 U.S. 171 (1983) in which the Court relying in part on its prior holding in *Grayned* found that time, place manner restrictions in public forums are permissible only if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.  *Id.* at 177.  Under both the *Grayned* approach and the current approach, the Court's analysis is focused on whether the content-neutral regulation is narrowly tailored to serve a significant government interest and affords an ample alternative means of communication.  Accordingly, the Supreme Court did not overruled or abrogate its holding in *Grayned* but instead still relies on *Grayned* in conducting public forum analysis.  *See e.g., International Socy. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 711 (1992) (J. Kennedy, concurring) (invoking the Supreme Court's analysis in *Grayned* to find that the unleased public areas at airports should be considered a public forum); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 763 (1988) (noting that "[p]resumably in the case of an ordinance that completely prohibits a particular manner of express, the law on its face is both content and viewpoint neutral.  In analyzing such a hypothetical ordinance, the Court would apply the well-settled

time, place and manner test") (citing *Grayned*, 404 U.S at 116)); *see also Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004) (noting that *Grayned* is a "seminal traditional public forum case").

Since, the Court has determined that Riverfront Plaza is a traditional public forum and analyzed the restriction at issue under an analysis that reflects the Supreme Court's holding in *Grayned*, the Court's prior analysis is therefore also applicable to Plaintiffs' Connecticut Constitution claim.   Therefore, the Court's prior analysis under current federal law took into consideration *Grayned*'s directive to assess whether the time, place and manner restriction was reasonable in light of the nature of the place and its pattern of normal activities, whether the restriction was necessary to further a significant government interest and whether ample alternative means of communication were afforded the Plaintiffs.   Accordingly, the Court likewise finds that Defendant did not violate Plaintiffs' rights to free speech under the Connecticut Constitution.

### c.  Plaintiffs' arrests were supported by probable cause

Probable cause to arrest exists where an Officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).  Moreover, "a claim for false arrest turns only on whether probable case existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to each individual charge, or,

indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

The Second Circuit has explained that "probable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties." *Walczyk v. Rio,* 496 F.3d 139, 156 (internal quotation marks and citation omitted).   Moreover, the Second Circuit has instructed that "[i]n assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*  In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.* at 157.

"Probable cause is to be assessed on an objective basis."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted).  "Other than the facts known to the arresting officer at the time of arrest, an officer's state of mind is irrelevant."  *Id.* at 153.  That is to say, "his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Id.*  Thus, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the

action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (internal quotation marks omitted).

"The Supreme Court has repeatedly stated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *U.S. v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (internal quotation marks and citation omitted).   "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest ... These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." *Id.* (citations omitted).

It has long been recognized that "probable cause is based on the facts warranting arrest and not the statute pursuant to which a plaintiff was charged" and the fact that the "actual charges were brought under a difference statute does not defeat a finding of probable cause." *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010); *Jaegly*, 439 F.3d at 153 ("The [Supreme] Court [has] rejected the view that probable cause to arrest must be predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer...."); *Rutigliano v. City of New York*, 326 Fed. Appx. 5, 2 (2d Cir. 2009) ("[O]ur Court has held that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer

at the time of arrest.") (internal quotation marks and citation omitted); *see also* *Zellner*, 494 F.3d at 369 ("[A]n arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime.").  Therefore the charge invoked by the arresting officer is not dispositive or always even relevant to the probable cause analysis.   Although Defendant Albert testified that he believed there was probable cause for criminal trespass, Albert's belief as to probable cause is irrelevant to the Court' inquiry.

The Court will therefore analyze whether probable cause could be predicated on a disorderly conduct charge.  In Connecticut, a person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person:

> (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person; or (3) makes unreasonable noise; or (4) without lawful authority, disturbs any lawful assembly or meeting of persons; or (5) obstructs vehicular or pedestrian traffic; or (6) congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse…

Conn. Gen. Stat. §53a-182.  The drafters of Conn. Gen. Stat. §53a-182 instructed that "Subsection (6) contemplates, in its reference to 'a reasonable official request to disperse', that the request be lawful; that is, that it not be in violation of the actor's right or privilege to remain where he is."  Conn. Gen. Stat. §53a-182, Commission Comment (1971).  In particular, the Court will analyze whether there was probable cause in connection with Subsection (5) and Subsection (6).

Here, when Officer Albert arrived on the scene he was informed by the event organizers that the Plaintiffs were obstructing the registration tent by standing in front of the raised patio holding a six foot by four foot high banner. Shluger and Greaser then explained to Albert that they were hosting a series of children's runs and expressed their concerns that Plaintiffs were obstructing access to and visibility of the registration tent where the participants and their parents would be congregating at to register before the races and then collect the food and prizes after the races.   Albert personally observed the Plaintiffs' stationary position in front of the steps to the raised patio immediately adjacent to the entrance of the registration tent.   Albert then engaged in a discussion with both the Plaintiffs and the event organizers where each expressed their concerns.

After this initial conversation, Plaintiffs refused to move to the area where other protestors were standing and instead moved up onto the first step leading to the raised patio.   At first, Albert was not sure how the event would proceed and what risks were present.   Albert testified that he was "slow to act" because he wanted to observe the event to assess how the event would function and determine the appropriate course of action under the circumstances for all parties concerned.   After Albert observed the first race, he understood that after the races ended the children and their parents would be coming back and congregating at the registration tent.   He observed that the registration tent would be the primary area where the 300 attendees would be congregating and lining up.   Albert also observed that Plaintiffs had moved again after their initial conversation and were standing on the second step of the raised patio just one

step below the entrance to the registration tent.   Albert observed that the participants had to go around the Plaintiffs and their large banner to reach the registration tent.   He also understood that more races would be run, increasing the number of children and adults who would be seeking to reach the tent.

Albert's observations of Plaintiffs' stationary position on the steps of the raised patio just adjacent to the registration tent and of the participants having to work their way around Plaintiffs and their large banner coupled with the fact that the registration tent would be the primary place where increasing numbers up to 300 participants would be gathering and lining up after the races ended constituted reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that the Plaintiffs were obstructing pedestrian traffic and posed a safety risk.

Plaintiffs argue that since the participants could walk around them they could not have been obstructing pedestrian traffic.   The word "obstruct" is not defined anywhere in the disorderly conduct statute.   *See* Conn. Gen. Stat. §53a-182.   The Connecticut Supreme Court has held that "[i]n construing the terminology of a statute, (t)he intent of a statute is to be sought first in the language used, and if that is unambiguous we need not resort to other aids of interpretation." *Hartford Elec. Light Co. v. Water Resources Comm'n*, 162 Conn. 89, 100 (1971) (internal quotation marks and citation omitted).   Here since "obstruct" is not defined and is ambiguous, the Connecticut Supreme Court instructs that "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language … Or,

66

stated another way, statutory language is to be given its plain and ordinary meaning." *Id.* (internal quotation marks and citation omitted).

Plaintiffs suggest that "obstruct" should mean a complete and entire blocking of passage or access.  Plaintiffs appear to suggest that they could only be "obstructing" if they were preventing the participants from entering the registration tent altogether.   Merriam-Webster defines the word "obstruct" as "(1) to block or close up by an obstacle; (2) to hinder passage, action or operation; (3) to cut off from sight. " Merriam Webster Online Dictionary, http://www.merriamwebster.com/ dictionary/obstruct (last visited January 17, 2012).   The second definition of "obstruct" as "to hinder passage" is applicable to the facts and circumstances of the present case.  Here, Zalaski and Oatis's presence on the steps of the raised patio while holding a 4 foot by 6 foot banner on a step adjacent to registration and prize area where 300 people were expected to congregate hindered the passage of participants into the registration tent and posed a safety risk.   Merriam-Webster also defines the word "hinder" as "(1) to make slow or difficult progress of; (2) to hold back." Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/hinder (last visited January 17, 2012).   A person of reasonable caution would believe that Plaintiffs' presence made it more difficult for the Red Nose Run participants to progress into and access the registration tent.  The Court therefore does not construe the meaning of "obstruct" as limited to a total blocking of access and instead finds that the term also encompasses a hindrance of access or progress.  *See State v. Biller*, 5 Conn. App. 616, 621 (1985) (considering Webster's Third New

International Dictionary definition of "obstruct" in analyzing the language under Conn. Gen. Stat. §53a-167a for interfering with an officer).

A recent Connecticut Appellate Court decision suggested that the hindrance of passage can also constitute an obstruction of pedestrian traffic.  In *State v. Muckle*, 108 Conn.App. 146 (2008) a group of abortion protestors demonstrated outside of a Planned Parenthood facility on the sidewalk.  The Appellate Court affirmed the Superior Court's conviction for disorderly conduct finding that there was sufficient evidence to establish that the defendants obstructed pedestrian traffic.  The Appellate Court affirmed the trial court's finding that the protestors "by their physical presence, together with the presence of their numerous bulky signs, [baby] carriages with signs placed on them, the bricks holding the carriage in place, and the location of the parties and the property within close proximity on the seven food sidewalk" blocked pedestrian traffic in violation of Conn. Gen. Stat. §53a-182 subsection (5).  *Id.* at 150.  In coming to this conclusion, the Appellate Court noted that the photographic and video evidence demonstrated that "pedestrians walked off the sidewalk to get around the signs, stroller and baby carriage on the sidewalk."  *Id.* at 154.  Although pedestrians could walk around the protestors in *Muckle* the Connecticut Appellate and Superior Court found that defendants had obstructed pedestrian traffic.   In the instant case, the fact that pedestrians could find a way around Plaintiffs and continue their progress into the registration tent as was the case in *Muckle* does not preclude a finding that an obstruction of traffic had occurred.

In *Muckle*, the dissent concluded that since one pedestrian "stepped onto the grass with the dog, she was hardly inconvenienced even slightly, let alone obstructed in her progress.  No one attempted to stop her, and she proceeded past the defendants without incident... One is not obstructed in this sense simply because one is obliged to step around another person who is also on the sidewalk."  *Id.* at 155 (J. Stoughton, dissenting).  Plaintiffs advocate that the Court to adopt the dissent's rationale.  However, the Court is not persuaded that the dissent's analysis is appropriate to the facts of the present case.  While the Court agrees that there would be no obstruction if an individual were to momentarily stop on a sidewalk forcing a single pedestrian to step around that individual to continue on their way, where two people holding a large banner stand stationary for a length of time in an entry-way through which hundreds of pedestrians are required to pass, there would be an obstruction.

The dissent's analysis in *Muckle* appears to be premised on the fact that the video only captured one pedestrian walking around the protestors and reflects the fact that there weren't many pedestrians on the sidewalk.  However, the facts of the instance case are inapposite.  There were hundreds of people attending the Red Nose Run that had sought access and would be seeking access to the registration area.  In *Muckle*, the Connecticut courts confronted a situation where at most three people were attempting to proceed on the sidewalk as opposed to a situation where hundreds would be attempting to proceed into the registration tent.  In such circumstances where a crowd of people, including very young children, would be forced to walk around a large stationary

69

impediment that would have the effect of hindering free passage.  Accordingly, Defendant Albert had probable cause that Plaintiffs were obstructing pedestrian traffic in violation of Conn. Gen. Stat. §53a-182 subsection (5).

In addition, Defendant Albert's interactions with Plaintiffs where Plaintiffs repeatedly refused to comply with his request that they relocate off the steps of the raised patio undoubtedly provided reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that the Plaintiffs had congregated with other persons in a public place and refused to comply with a reasonable official request in violation of Conn. Gen. Stat. §53a-182 subsection (6).  As discussed above in connection with Plaintiffs' federal and state free speech claims, Albert's request that they relocate off the steps of the raised patio was a reasonable request that was an appropriate content-neutral time, place, manner restriction under the First Amendment.  Further, since his request was a permissible time place manner restriction the request was lawful and was not in violation of Plaintiffs' right or privilege to remain where they were.  After all, it is well-established that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. 640, 647 (1981).

Plaintiffs argue that Defendant Albert did not speak with or request Plaintiff Zalaski to move and therefore suggest that Zalaski could not have refused to comply with a reasonable official request.  However from the video recording and Albert's testimony, it is clear that his request to move was aimed at both Oatis and Zalaski.  First, Zalaski was standing about four feet away from Oatis and they

70

were jointly holding the banner.   Further on the video, Zalaski can be heard speaking to the police officers immediately prior to her arrest.  Zalaski can be heard telling the officers that "they have all been running through what do you want" and "arrest me too."  Moreover the video recording unequivocally demonstrates that Oatis did in fact hold himself out as the spokesperson and leader for the protestors.  Oatis gave his card to Albert when he arrived identifying himself as an attorney and told Albert that "believe me I am making sure we are standing where we need to stand.  If we are not then I will direct people to move."  It was therefore not surprising that Albert mainly conversed with Oatis since Oatis clearly held himself out as the spokesperson and the leader.  However the fact that Albert mainly conversed with Oatis does not support an inference that his directive to relocate was not also aimed at Zalaski. The fact that Oatis held himself out as the leader, that his wife Zalaski was standing four feet away holding the banner with Oatis, the fact that Zalaski herself was interacting and speaking with the officers provided sufficient trustworthy information that would warrant a person of reasonable caution in the belief that both Zalaski and Oatis had refused to comply with a reasonable official request.

The Court is mindful that the Connecticut Appellate Court in *State v. Anonymous*, 33 Conn. Supp. 93 (Conn. Com. 1976) held that individuals "engaged in the lawful expression of their constitutional rights may not be deprived of those rights because they refused to obey an order to disperse."  33 Conn. Supp. 93 at 99.  The appellate court explained that "for an order to disperse to be lawful, the actor's prior conduct must at least be such that a breach of the peace has

71

become imminent or might reasonably be expected or intended to flow from such conduct." *Id.* The Appellate Court also noted that their ruling did not mean "that the defendants could not, under other circumstances, be legally ordered to disperse; the court's findings are limited to the factual situation in the present cases. If the defendants were not violating the law when they were first ordered to move, the objective situation created by them must have at the least posed an imminent threat to the public peace." *Id.* at 98.

The facts of *Anonymous* are distinguishable in several important ways from the instant case. In *Anonymous*, the defendants were arrested after approaching a complainant in the parking lot of a shopping plaza and trying to sell the complainant a newspaper and soliciting support for a "radical political party." *Id.* at 94. When the police arrived, the defendants "engaged in political debate with the officers on the proper function of the police in our society; the officer characterized that as an attempt to confuse him. In the course of that discussion, a crowd of unspecified size had gathered." *Id.* at 94. The police then decided that the "defendants were 'making a scene'" and placed them under arrest. *Id.* at 95. The appellate court noted that the defendants did not congregate until the police brought them together and that a crowd of onlookers had only formed in response to the police presence. *Id.* at 95, 99.

First, the police in *Anonymous* gave an order to disperse as opposed to Albert who simply ordered that Plaintiffs relocate to an area nearby and therefore did not bar the Plaintiffs speech entirely but merely placed a reasonable time, manner place restriction on such speech. Second as discussed above, the

Plaintiffs were obstructing pedestrian traffic and were therefore violating the law when they were in fact ordered to move.  In *Anonymous*, the Appellate Court held that the Defendants were not obstructing traffic where the defendant stood outside of complainant's automobile door so that complainant had to force his way out.

Further, the objective situation created by the Plaintiffs did pose an immediate threat to public safety as it was expected that a large number participants and their parents would be streaming into the registration tent at the end of the last races to receive the food and prizes being distributed.  Therefore, there was the reasonable expectation that a large crowd of people would be shortly descending onto the steps where Plaintiffs were standing stationary with a large banner and that would have the effect of further exacerbating the risks posed to the safety of those attempting to access the registration tent.  Whereas in *Anonymous*, the Appellate Court held that the defendants were presenting no threat to public safety or the free flow of pedestrian traffic since the three defendants were standing apart from each other in the parking lot and had not attracted a crowd until after the police rounded them up.  Here, there was a present and immediate threat to the safety and flow of pedestrian traffic into the registration tent.  Accordingly, Albert's request was lawful and therefore Plaintiffs' refusal to comply with such lawful request could constitute disorderly conduct under Conn. Gen. Stat. §53a-182 subsection (6).   For the foregoing reasons, Plaintiffs arrests were supported by probable cause.

i.    *Qualified Immunity – Arguable Probable Cause*

"With respect to qualified immunity, the Supreme Court has recently reminded us that 'the appropriate question is the objective inquiry of whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer [ ] possessed.'" *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Wilson v. Layne*, 526 U.S. 603 (1999)). "Lawful arrest, i.e., arrest pursuant to probable cause, requires the arresting officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* (internal quotation marks and citation omitted). "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer [need not show probable cause, but rather] need only show 'arguable' probable cause." *Id.*

"Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (internal quotation marks and citation omitted). Arguable probable cause exists then "'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted).

"Although the tests for probable cause and arguable probable cause are thus not congruent, the concept of probable cause is the same in both inquiries.

Probable cause existed if *at the moment the arrest was made* ... the facts and circumstances *within the [officers'] knowledge* and of which they *had reasonably trustworthy information* were sufficient to warrant a prudent man in believing' that [the suspect] had violated the law, and an officer sued under the Fourth Amendment for false arrest is entitled to immunity if a reasonable officer could have believed *that probable cause existed*." *Zellner*, 494 at 370 (internal quotation marks and citations omitted) (emphasis in the original).  "Accordingly, like the probable cause analysis, the analysis of a qualified immunity defense to claims that official actions were taken without probable cause entails an inquiry into the facts known to the officer at the time of the arrest a court must evaluate the objective reasonableness of the [Officer's] conduct in light of ... the information the ... officers possessed." *Id.* (internal quotation marks and citations omitted).

Here, Defendant Albert has demonstrated there was arguable probable cause as it was objectively reasonable for an officer to believe that by standing stationary with a large banner in the middle of steps leading up to a tent where hundreds of people would shortly be accessing was a hindrance to free passage and therefore an obstruction under Conn. Gen. Stat. §53a-182 subsection (5). Likewise as discussed above it was objectively reasonable for an officer to believe that under the First Amendment they had the lawful authority to request that protestors move to an area nearby and therefore it was also objectively reasonable for an officer to believe there was probable cause under Conn. Gen. Stat. §53a-182 subsection (6) when plaintiffs refused to comply with such a

reasonable and lawful request.   Objectively reasonable police officers would believe that they had the lawful authority to implement a content-neutral time, place manner restriction on speech that served a significant government interest in public safety narrowly.   As discussed above, since it was objectively reasonable for a police officer to believe a request that struck a balance between the speaker's right to expression and the government's interest in safety, pedestrian traffic and ensuring the rights of permit-holders was lawful, Defendant Albert had arguable probable cause and would also be entitled to qualified immunity in connection with Plaintiffs' claims arising out of their arrest.

Since the Court has found that plaintiffs' arrests were supported by both probable and arguable probable cause, Defendant is not liable for false arrest or malicious prosecution under the Fourth Amendment.   In Connecticut "a false arrest claim cannot lie when the challenged arrest was supported by probable cause." *Russo v, City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citations omitted).  In addition,  in order to prevail on a § 1983 claim for malicious prosecution, "a plaintiff must prove the following elements: (1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) 'the defendant acted without probable cause'; and (4) 'the defendant acted with malice.'"  *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444, 446 (1982)).

The Court also notes that Plaintiffs have not produced any evidence that Defendant Albert exhibited malice.  Under Connecticut law, the "element of

malice implicates an evil or unlawful purpose… and includes the pursuit of the lawful end by the intentionally unlawful means." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996).  A Plaintiff must show that the defendant "acted primarily for a purpose other than that of bringing an offender to justice." *McHale*, 187 Conn. at 447.  In addition, "malice can be inferred from a want of probable cause." *Brown v. Aybar*, 451 F. Supp. 2d 374, 384 (D. Conn. 2006) (citing *Vandersluis v. Weil*, 176 Conn. 353, 356 (1978)).   Here, there is no evidence of malice nor is there any evidence that Albert took issue with Plaintiffs or their message.  Plaintiff Zalaski testified that Albert acted in courteous manner and did not exhibit any malice towards her or anyone else.   As the Court previously found and the video tape recorded by the protestors depict, Albert behaved in a calm and respectful manner.  There is simply no evidence that he was motivated by an evil or unlawful purpose.

### d. First Amendment Retaliation Claim

While Plaintiffs have only alleged a single cause of action with respect to the First Amendment as noted above the parties' pleadings and submissions before and at trial vaguely suggest that Plaintiffs have asserted two separate and distinct causes of action under the First Amendment.  In addition, both Plaintiffs and Defendants have introduced evidence with regard to whether Defendant's action chilled the exercise of Plaintiffs' First Amendment rights.  The analysis with respect to whether Defendant's actions had a chilling effect is pertinent to a First Amendment retaliation claim.  Although Plaintiffs never use the word "retaliate" or "retaliation" in their complaint, based on the evidence submitted at

trial regarding chill, the Court will proceed as if the Plaintiffs have also asserted a cause of action for First Amendment retaliation.

The "elements of a First Amendment retaliation claim are dependent on the 'factual context' of the case.'"  *Mangino v. Incorporated Village of Patchogue*, 739 F.Supp.2d 205, 247 (E.D.N.Y. 2010) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)).  In the context of a private citizen's action against public officials, the plaintiff must show that: "(1) [the plaintiff] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [a plaintiff's] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right."  *Old St. George's LLC v. Bianco*, 389 Fed. Appx. 33, 35 (2d Cir 2010).  In addition, "no first amendment retaliation claim based on an arrest and/or criminal prosecution is available where the prosecution at issue was supported by probable cause."  *Allen v. City of New York*, No.03Civ.2829(KMW)(GWG), 2007 WL 24796, at *22 (S.D.N.Y. Jan. 3, 2007) (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1179-80 (2d Cir. 1992)).  Therefore, "when probable cause to arrest exists, police may arrest an individual even if the arrest could limit the exercise of that individual's First Amendment rights."  *Aho v. Chitteck*, No.3:09-cv-728(CFD), 2011 WL 2709836, at *4 (D. Conn. July 12, 2011).

In order to meet the second element of intent, Plaintiffs need to submit "specific proof of improper motivation."  *Curly v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  "Evidence of improper motive 'may include expressions by the officials regarding their state of mind, circumstances suggesting in a substantial

fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'" *Anderson v. City of New York*, No.06-CV-5363(KAM)(VVP), 2011 WL 4403622, at *14 (E.D.N.Y. Sept. 20, 2011) (citing *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995)).

In order to meet the third element, or the chilling requirement, a plaintiff must come forward with evidence showing either that (1) defendants "silenced" him or (2) defendants' actions had some "actual, nonspeculative chilling effect" on his speech. *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002).  Actual chilling must be established by "a change in behavior" since "a subjective chill cannot serve as a substitute for a specific objective harm." *Aretakis v. Durivage*, No.07-cv-1273, 2009 WL 249781, at *21 (N.D.N.Y. Feb. 3, 2009) (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)); accord *Curley*, 268 F.3d at 73.

Since probable cause supported plaintiffs' arrest no first amendment retaliation claim is available to Plaintiffs.  Further, Plaintiffs have not produced any evidence that Albert had an improper motivation and that his actions were motivated by the Plaintiffs' exercise of their First Amendment rights.   As noted above, Albert did not arrest the protestors who were standing across the walkway and had acted in a respectful and calm manner towards Plaintiffs.

Lastly, Plaintiffs have also not demonstrated that Albert's actions had an actual chilling effect on their speech.  Zalaski testified that after she was arrested in 2006 at the Red Nose Run that she regularly attended circus or circus related protests in 2007, 2008 and 2009.   In fact, Zalaski had attended the 2007 Red Nose

Run and was even arrested again several months after the incident at issue in this litigation in Bridgeport at a circus protest.  There is simply no evidence of a chilling effect when Zalaski still continued to regularly protest the abuse of animals at the circus including protesting at the same event held in the same place a year later.  *See e.g., Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (finding no chill where plaintiff continued to publish newspaper criticizing the local government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chill where after filing of lawsuit plaintiffs continued to write editorials in the same manner as before the lawsuit).

Zalaski tries to demonstrate chill by arguing that when she protested at the Red Nose Run a year later she did not attempt to stand on the steps as she had previously done and therefore her speech was chilled by the fact that she felt she could not protest from the steps.  However, the fact that Zalaski chose to stand in a different location at the 2007 Red Nose Run cannot be considered an actionable change in behavior as she was still engaging in the exact same expressive conduct as she had before but just in a different location.  The Second Circuit's holding in *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001) supports this conclusion.  In *Curley*, the plaintiff, Curley, was arrested during his candidacy for the office of village mayor.  Curley claimed that his speech was chilled even though he ran for public office again after his arrest.  He insisted that "his 1995 campaign was affected by his arrest—namely, that it was demoralized and only amounted to a token effort."  *Id.* at 73.  However, the Second Circuit found that "the fact remains that Curley chose to run for public office even after the events

of August 1994.  Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Id.* Zalaski chose to continue to protest the Red Nose Run much as Curley had chosen to run for public office again.    Accordingly, Zalaski did not demonstrate any real change in her behavior and therefore cannot demonstrate the requisite chilling effect.

### V.    Conclusion

Based upon the above reasoning, the Court finds there was no violation of Plaintiffs' First or Fourth Amendment rights.  The Clerk is directed to enter judgment for the Defendant and close the file.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: January 18, 2012